William A. BORDERS, Jr., Plaintiff,

v.

Ronald REAGAN, President, United States of America, Alexander Haig, Government of the District of Columbia, District of Columbia Judicial Nomination Commission and Philip A. Lacovara, Defendants.

Civ. A. No. 81–1312.

United States District Court, District of Columbia.

July 7, 1981.

Dudley R. Williams, Robert L. Bell, Washington, D. C., for plaintiff.

Dennis A. Dutterer, Asst. U. S. Atty., Michael E. Zielinski, Asst. Corp. Counsel, Washington, D. C., Frederick B. Abramson, Chairperson, D. C. Judicial Nomination Commission, Washington, D. C., for defendants.

### OPINION

JOHN GARRETT PENN, District Judge.

The plaintiff, William A. Borders, Jr., was appointed to the District of Columbia Judicial Nomination Commission (Commission), pursuant to Section 434 of the District of Columbia Self-Government and Governmental Reorganization Act (Act)[1], 11 D.C.Code App. § 434 (Supp. IV 1977), by President Carter in July 1980. The term of the appointment was five years or until July 1985. On May 16, 1981, President Reagan purported to appoint Philip A. Lacovara in place of plaintiff. On that same date the President advised the plaintiff by letter that he had appointed a successor to his position on the Commission and advised him that the plaintiff's "membership on that Commission is terminated as of this date". He thanked plaintiff for his "dedicated service".[2]

The plaintiff now brings this action for a permanent injunction and declaratory relief and asks, among other things, that the Court enter an injunction compelling the

1. P.L. 93–198, 87 Stat. 774.

2. Compl.Ex. A.

President and the Secretary of State[3] to withdraw the certificate purporting to appoint Mr. Lacovara to the Commission.

## I

*Underlying Facts*

There are no factual issues in this case. The plaintiff, a well-known and respected member of the bar, a practicing attorney in the District of Columbia and the current President of the National Bar Association, a national professional organization, was duly appointed to the Commission by President Carter on July 2, 1980, for a term of five years or until July 1985, at the expiration of the term of President Ford's appointee. Mr. Borders' predecessor, Mr. Willie F. Leftwich, had been named by President Ford in 1975, and had served a full term. President Carter was defeated in his bid for reelection by President Reagan in November 1980. Although it is undisputed that Mr. Borders has given dedicated service to the Commission, President Reagan decided to replace Mr. Borders with a representative of his own choosing. Accordingly he appointed Mr. Lacovara, also a distinguished practicing attorney in the District who is well respected in the local legal community. The President makes no contention that Mr. Borders has not faithfully and ably fulfilled his Commission duties. The decision to appoint Mr. Lacovara in place of Mr. Borders results simply from the desire of the President to exercise what he feels to be his right to appoint the Commission member who represents the President.

The letter purporting to terminate Mr. Borders' position on the Commission was delivered to plaintiff on May 16, 1981, and he filed the instant action on June 8, 1981.

*The Posture of This Case*

At the time he filed his complaint, the plaintiff also filed a motion for a temporary restraining order and a motion for a preliminary injunction. Since it appeared that this case would require expedited treatment and consideration in view of an anticipated vacancy on the Superior Court of the Dis-

trict of Columbia, the Court, *sua sponte*, scheduled the case for a Status Hearing on June 10, 1981. The plaintiff advised the Court at the Status Hearing that since no Commission meetings were scheduled in the near future, he did not wish to pursue his motion for a temporary restraining order, and it was agreed by the parties that they would present arguments on the motion for preliminary injunction on June 18, 1981. The Court entered an order setting that date for the hearing and establishing a briefing schedule. *See* Order filed June 10, 1981.

The Court heard oral arguments on June 18, 1981. Just prior to the arguments, all parties agreed that the hearing on the motion should be consolidated with the trial on the merits pursuant to Fed.R.Civ.P. 65(a)(2). The motion hearing was consolidated with the trial on the merits since there were no outstanding genuine issues of material fact and the legal issues had been fully briefed by the parties, taking into consideration the expedited treatment accorded this case.

*Position and Alignment of the Parties*

The President, the Secretary of State, and Mr. Lacovara, sometimes hereinafter referred to as the federal defendants, argue that the removal of Mr. Borders and the appointment of Mr. Lacovara were within the power of the President and they ask that this action be dismissed.

The District of Columbia (District) was joined as a party defendant since it "grants special rights, privileges and emoluments, to the members of the Judicial Nomination Commission pursuant to P.L. 93–198 [the Act]". Compl. ¶ 7. However, the District *favors* the relief requested by the plaintiff and argues that the members of the Commission do not serve at the pleasure of the appointing authority and may not be removed at will. The District bases its argument on the Constitution, Article I, Section 8, Clause 17, which provides in part that Congress shall "exercise exclusive Legislation in all Cases whatsoever, over [the] Dis-

---

**3.** The Secretary of State was joined as a defendant in this action since he is charged with the responsibility of making out, recording and

affixing the seal of the United States to the Commission of an Officer appointed by the President. *See* 5 U.S.C. § 2902.

trict". It contends that Congress, pursuant to the authority granted by the Constitution, properly delegated certain of its powers to the local government and the Commission, pursuant to the Act and the District of Columbia Court Reform and Criminal Procedure Act of 1970 (Court Reform Act), P.L. 91–358, 84 Stat. 473, and thereby circumscribed the power of the President. The District further urges that Congress intended that the "Commission maintain an independent status ... free from the potential for disruption posed by serving at the will of the appointing authority". District of Columbia Response at 2–3. According to the District, the members of the Commission are not officers of the United States, *see* U.S.Const., art. I, § 2, cl. 2, but are merely agents of the Congress. The District interprets Section 434 of the Act as not limiting the term of the federal appointee to the Commission to five years, but rather, establishing a term of five years.[4]

The final named defendant is the Commission. The Commission in a letter dated June 17, 1981, signed by its chairperson, Frederick B. Abramson, and concurred in by five members, with one abstaining[5], takes no position at this time "with respect to the varying contentions made by the parties or the merit of the issues involved in the lawsuit". The Commission was also unanimously of the view

> that Congress, in creating the Commission, intended to institute a merit selection process for the appointment of judges to the nonfederal courts of the District of Columbia, and that, in order to carry out this function, the Commission as a whole through its individual Members should have a high degree of independence from political control.

### Time Constraints

There are certain time constraints in this case which necessitate expedited consideration of the not insubstantial issues raised herein. In an effort to render a decision at the earliest time, it is necessary for the Court to shorten its discussion of the applicable law.

The work of the Commission and the time frame in which it must be accomplished is more fully set forth in Part II, *infra*. Suffice it to say however, that once a vacancy occurs on either of the two local courts, the Superior Court or the District of Columbia Court of Appeals, the Commission "shall, within thirty days following the occurrence of such vacancy submit to the President, for possible nomination and appointment a list of three persons for every vacancy". Act, § 434(d)(1).

Recently there were four vacancies on the local courts, three in the Superior Court and one in the Court of Appeals. President Reagan, after securing the lists from the Commission in accordance with Section 434(d)(1) nominated three persons for the Superior Court and one for the Court of Appeals. The person named for the Court of Appeals, Judge James A. Belson, is presently a judge on the Superior Court and when he is appointed yet another vacancy will exist on that court thereby setting into motion the Commission's consideration of other names to submit to the President. The Court is advised that Judge Belson has been confirmed, thus the Commission will be required to submit a list of names for the upcoming vacancy on the Superior Court within slightly more than thirty days.

### II

In considering whether the President has the power to remove the plaintiff prior to the expiration of his term, the Court must first address the language of Section 434 of the Act which established the Commission. If the Act grants such power then there is no need to consider the other arguments made by the parties.

The Act establishes a Commission of seven members who are appointed for staggered terms of six years, except for the

---

**4.** The question of removal for disability or good cause is not before the Court.

**5.** For obvious reasons neither Mr. Borders nor Mr. Lacovara was consulted by the Commission.

member appointed by the President, who is appointed for five years. Act, § 434(a). No person may be appointed to the Commission unless he is a citizen of the United States, a bona fide resident of the District of Columbia, and has maintained an actual place of abode in the District for at least 90 days immediately prior to his appointment, and is not a member, officer or employee of the Legislative Branch or of an executive or military department or agency of the United States, and except for the judicial member of the Commission, is not an officer or employee of the judicial branch of the United States or the District of Columbia. Act, § 434(b)(1). These qualifications are the same as for any judicial candidate for selection to the local courts. See Act, § 433(b).[6] The qualifications for members of the Commission are similar to those of the Commission on Judicial Disabilities and Tenure. See Act, § 431.

The members of the Commission are appointed by different persons. One member is appointed by the President, two by the Board of Governors of the Unified District of Columbia Bar, two by the Mayor, one of whom shall not be a lawyer, one by the City Council, who shall not be a lawyer, and one by the Chief Judge of the United States District Court for the District of Columbia, who shall be an active or retired Federal Judge serving in the District. Act, § 434(b)(4). Except for the Federal judicial member of the Commission who serves without additional compensation, the other members receive "the daily equivalent at the rate provided by Grade 18 of the General Schedule, established under Section 5332 of title 5 of the United States Code, while actually engaged in service for the Commission". Act, § 434(b)(5).

In the event of any vacancy on either of the local courts, the Commission is required to submit to the President, three names for each vacancy for possible nomination and appointment. Any nomination made by the

President is with the advice and consent of the United States Senate. If the President fails to nominate one of the persons on the list submitted by the Commission within 60 days after receiving the list, the Commission "shall nominate, and with the advice and consent of the Senate, appoint one of the persons named on the list". Act, § 434(d)(1).

With respect to the term each member of the Commission shall serve, the statute provides:

§ 434. District of Columbia Judicial Nomination Commission.

(a) There is established for the District of Columbia the District of Columbia Judicial Nomination Commission (hereafter in this section referred to as the "Commission"). The Commission shall consist of seven members selected in accordance with the provisions of subsection (b). Such members shall serve for terms of six years, except that the member selected in accordance with subsection (b)(4)(A) shall serve for five years; of the members first selected in accordance with subsection (b)(4)(B), one member shall serve for three years and one member shall serve for six years; of the members first selected in accordance with subsection (b)(4)(C), one member shall serve for a term of three years and one member shall serve for five years; the member first selected in accordance with subsection (b)(4)(D) shall serve for six years; and the member first appointed in accordance with subsection (b)(4)(E) shall serve for six years. In making the respective first appointments according to subsections (b)(4)(B) and (b)(4)(C), the Mayor and the Board of Governors of the unified District of Columbia Bar shall designate, at the time of such appointments, which member shall serve for the shorter term and which member shall serve for the longer term. Act, § 434(a).

The statute makes no provision for the removal of members of the Commission but

---

**6.** Prior to the Act, 11 D.C.Code App. § 433(b), there was no requirement that persons selected as judges on the local courts be bona fide residents of the District of Columbia or that they maintain an actual place of abode in the

District. It was only required that such persons appointed be bona fide residents of the District or the surrounding contiguous counties in Maryland or Virginia. See 11 D.C.Code § 1501(b).

it does provide that "[a]ny *vacancy* on the Commission shall be filled in the same manner in which the original appointment is made" and that "[a]ny person so appointed to fill a *vacancy* occurring *other than upon the expiration* of a prior term shall serve only for the remainder of the *unexpired* term of his predecessor" (emphasis the Court's). Act, § 434(b)(2).

 The language of the statute makes clear that Congress did not intend that a member of the Commission serve only at the pleasure of the appointing authority or that he be removable at will; rather, once an appointment is made it is anticipated that the member will serve a complete term. This is demonstrated by the plain wording of the statute in that it provides that a member "shall serve" for the term of six years, except for the member appointed by the President, who shall serve five years. The statute makes no provision for the removal of a member, but does provide for the appointment of a member *when a vacancy occurs*. Act, § 434(b)(2). Section 434(b)(2) contemplates that vacancies will occur *only* at the expiration of a term but provides that in the case of a vacancy "occurring other than upon the expiration of a prior term", the appointee shall serve only for the "*remainder* of the *unexpired term* of his predecessor". (emphasis the Court's) *Id.*

The intent that members be isolated from political considerations and political changes in order that they may exercise their decisions free from outside influences, other than may be necessary for the consideration of candidates for judicial offices, is also demonstrated by the provision for staggered terms. The fact that the terms are staggered and that each is for a set period of years, reflects the decision of Congress to maintain continuity on the Commission without abrupt changes. This, of course, is necessary taking into consideration that when a vacancy occurs the Commission is under severe time constraints to submit a list of names for the vacancy. Any interpretation of the statute that would permit the removal of a Commission member at will would obviously make it difficult for the Commission to fulfill its statutory duties.

This Court concludes then that the plain language of the Act establishes the right of any Commission member to serve out his term without fear of removal. Removal at will is not consistent with the intent of Congress.

### III

From this discussion of the background of and the specific provisions contained in the statutes establishing substantial home rule and reforming judicial administration in the District of Columbia, it is clear that the statutory intent was to ensure, so far as possible, the independence of the District's judicial personnel Commissions. To further the overriding concern of freeing judicial personnel decisions for the local courts from political pressures and considerations, be it from local or federal sources, the Act endeavored to ensure that judicial selection, retention and disqualification would be decided solely on the basis of merit. To that end, the Act established the exceptional device of two parallel Commissions, one on Nominations and the other on Tenure and Disqualifications. It constituted both in the same way, as outlined in Part II, *supra*, and provided an elaborate procedure designed to safeguard the goal, shared by Congress and the President, that only merit should guide judicial personnel decisions for the local courts.

In its grant to five different authorities of appointive power over the seven offices created on each Commission the Act aimed not at a scheme of permitting each of various interest groups to have its "own man" (or woman) on the Commissions, but rather reflected a realization that various *institutional* points of view *on merit qualifications* were worthy of representation. Though a local view, a federal view, a Bar view, and a judicial view were to be represented, it was merit that would be the focus for all of the "viewers," not political or philosophical conformity with the opinions of the President, the Mayor, or the other appointing authorities.

Moreover, the legislative history makes quite clear that the Act, far from intending the President's appointee to represent the institutional viewpoint on merit of the presidency or even the Executive Branch, intended that that person would represent the overall *federal* interest and viewpoint.

The judicial nomination procedure as encompassed in the conference report reflects both the *Federal* interest in local judicial nominees and the need for a merit selection process for these nominees.

The purpose of the new Judicial Nomination Commission is to recommend qualified persons to the President of the United States to fill vacancies on either of the District of Columbia local courts. The composition of the Commission reflects both the need for community input and representation of the *Federal* interest in the consideration of nominees for judgeships.

*See* 119 Cong.Rec. 42038 (1973) (emphasis supplied).

Moreover, the statute forbids the appointment of an official of *any* of the federal branches of Government (except in the case of the one member who must be a federal judge) to the Commission. *See* Act, § 434(b)(1). In particular, no member, officer or employee of any executive department or agency of the United States can be appointed. *Id.* at 434(b)(1)(C).

The provisions of the statute are entirely consistent with the intent to safeguard merit selection by insulating the Commission from political pressure.[7] The statute fixed terms longer, sometimes substantially longer, than those of the appointing officials (except, on occasion in the case of the one member who must be a federal judge, whose appointing official, the Chief Judge, may, depending on age factors, serve more than six years as Chief Judge). While the Mayor serves a four-year term, the statute provides his two appointees with six-year terms. Indeed, both of the current Mayor-appointed members were appointed by the

---

**7.** The clear intent of the acts involved in this case was to make judicial selection (and tenure and disqualification) for the local courts as independent of federal and, particularly, presidential control as possible. Indeed, the original Senate bill provided for establishment of a judicial nomination commission consisting of five members: "2 to be appointed by the Mayor from Bar Association lists, 2 non-lawyers to be appointed by the Mayor from [City] Council lists, and the Chief Judge of the District of Columbia Court of Appeals." 1973 *D.C.Code Leg. & Adm.Service* 645–46 (legislative history of P.L. 93–198). That Commission would prepare a list of three names, from which *the Mayor* would appoint one. *Id.* at 645. The House version differed in that it gave various relevant institutional interests, particularly federal ones, greater representation on the Commission. It did not diverge in contemplating any less *independence* for the members of that Commission. For example, the House amendment set *longer terms*, not the four years of the Senate version, but six. It proposed the following composition of that Commission: "2 appointed by the Unified D.C. Bar, 2 appointed by the Mayor from Council lists, 1 member appointed by the Speaker of the House of Representatives and 1 member appointed by the President of the Senate, and 3 members appointed by the President. . . ." *Id.* at 646. The Commission would prepare a list of three to five names, from which *the President* would appoint one, "subject to Senate approval." *Id.*

It is clear from both those versions and from the Conference substitute, enacted into law and set forth in this opinion, that the two Houses disagreed about the institutional interests to be represented on the Commission, particularly the proportion of federal to local representation, but not about the need for the commissioners, however appointed, to be free, once appointed, from political pressures, whether local or federal, whether from a legislative or an executive source. The debates in Congress also amply show the legislative intent to insulate the Commission. For example, Congressman Smith of New York stated:

An innovation in the committee bill, which in my estimation is a great step forward, is the creation of a District of Columbia Judicial Nomination Commission. This is a variation of the Missouri plan for selecting judges and represents the growing trend in the United States toward the selection of able and qualified judges, as insulated from politics and political pressure as possible.

Committee Print: Home Rule for the District of Columbia 1973–1974, Background and Legislative History of H.R. 9056 and H.R. 9682 and Related Bills, 93rd Cong., 2d Sess., at 2172.

Congressman Breckenridge of Kentucky stated:

[T]he real point here . . . is that the law will govern and determine the quality of the bench of the District of Columbia, and not the President of the United States and not the Mayor of the District.

*Id.* at 2375.

current Mayor's predecessor. City Council members' terms range from two to four years, yet their appointee serves a six-year term. The Board of Governors of the Unified Bar of the District of Columbia serve only a three-year term yet, again, the Bar appointees serve for six years.

With respect to the President's appointee, the statute specifically establishes a five-year term, though the President's term is, of course, only four years. Thus, the statute, signed by the President, necessarily contemplates the "hold-over" on the Commission of the prior President's appointee into the term and possibly even *throughout the entire term* of his successor. It is clear that that result, sought by the statute, would be defeated by reading into the statute a power of presidential removal at will of his federal appointee. In sum, the Act contemplated the very situation now before this Court. As a matter of statutory construction it resolved this situation in favor of the plaintiff. It denied a power of removal at will to the appointers of Commission members. In the case of the President's appointee it made that intent particularly manifest. It chose a term for the President's appointee that necessarily plays "leapfrog" with that of the President. It forbade appointment of persons from the federal executive branch of government. And it stressed that the President's appointee was charged with representing the *federal* viewpoint, not that of the President or the Executive Branch.

*Constitutional considerations*

Of course, the Court's conclusion on the matter of statutory construction hardly resolves this dispute. The federal defendants have asserted a number of constitutional defenses to the plaintiff's claim. They assert that the President can remove the plaintiff at will regardless of the contrary command of the statute, and notwithstanding the former President's acquiescence in

the holding over throughout almost his entire presidential term of the plaintiff's predecessor. They claim that removal at will is the President's constitutional right. That argument takes as its starting point the Appointments Clause, U.S.Const., Art. II, sec. 2, cl. 2, which reads in pertinent part:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

Their argument continues that the plaintiff is an officer of the United States. Thus, they claim, he is either one of those high officers "whose appointments are not herein otherwise provided for," and who must be nominated by the President and approved by the Senate, or one of those "inferior officers" whose appointment Congress has thought it proper to vest in the President alone. In either event, the federal defendants argue, since the power to appoint carries with it the power to remove, the President may remove at least his appointee to the Commission at will.

This argument presents obvious problems.[8] If the President's appointee to the Commission is a high officer he must be approved by the Senate. Yet, there is no requirement in the Act that the President, or for that matter the other appointing authorities, seek the advice and consent of the Senate. If Senate confirmation is necessary, it follows that no member of the Commission has been validly appointed.[9]

---

**8.** The Appointments Clause and the appointive and removal powers in the context of this case will be discussed at some length, *infra*.

**9.** The federal defendants hint at a position that the entire Commission system is invalid. *See* Federal Defendants' Memorandum in Opposi-

tion to Plaintiff's Motion for Preliminary Injunction at 10 n.3: "Assuming that a restriction of this sort [having a Commission that "assist[s] in the appointment of judges"] on the President's power to appoint these judges is permissible at all . . . ."

Thus, it appears that the federal defendants base their Appointments Clause argument on the plaintiff's being an "inferior officer." This argument assumes then that the members of a blue-ribbon panel charged with the use of their independent judgment in the crucial public service of selecting those candidates most fit to be the trial and appellate judges for the local courts of the Nation's capital are "inferior" officers. If one of them is an inferior officer of the United States, all of them are. Hence, under this argument, their appointment would have to be vested in either the President alone, the courts of law, or the head of a federal department. It would follow that five of the seven members of the Commission have been improperly appointed and are serving unlawfully, since neither the Mayor, the Bar, nor the City Council is president or a court of law or head of a federal department.

At the oral argument on the merits of this case, counsel for the federal defendants stated that their position is that only the President's appointee is an officer of the United States, and that none of the other Commission members is. That is based on the circular notion, for which there is some support in a number of old cases, see, e. g. *United States v. Germaine*, 99 U.S. 508, 25 L.Ed. 482 (1878), that the way to determine whether an official is an "officer of the United States" is to examine by whom he was appointed. First, that rule has been much criticized and is open to serious question today. Second, it clearly should not apply to the somewhat unusual context of this case. All seven Commission members have identical duties and offices (except that the presidential appointee has a term fixed at one year less than those of the others) *created under the same statute*.

The Court recognizes that one possibility is that no member is an "officer of the United States" as that term is used in the Appointments Clause, but rather that all are officers of the District of Columbia, or simply should not be deemed officers of the United States for that or some other reason.

The federal defendants appear to believe that the outcome of this case may hinge on whether members of the Commission are or are not "officers of the United States". They argue that *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) controls this case and compels the result that members of the Commission are officers of the United States by virtue of the language in that opinion that "any appointee exercising significant authority pursuant to the laws of the United States" is such an officer. While the plaintiff's work on the Commission *is* "significant", he is hardly entrusted with enforcing the laws of the United States to the degree or in the sense as were the Federal Election Commissioners in *Buckley*. While they were charged with interpreting and enforcing the complex federal statutes regulating various aspects of elections, the plaintiff here is charged with the use of his best judgment in determining the merit of potential judges. Except for the fact that his position arises under federal law, which will often be the situation in cases where the question is whether a particular *government* official is an "officer of the United States," the faithful execution of his office and duties has no more to do with interpreting or applying the law of the United States than do the personnel decisions of a hiring co-ordinator at a law firm. Moreover, this Court concludes that *Buckley* is distinguishable from this case for a number of other reasons. For example, that case did not involve the unique home rule, federal/local problem that is presented by a case involving the District of Columbia, and that case involved the question whether all Federal Election Commissioners had been properly *appointed*, not whether one of them had been properly *removed*. "[T]he [Appointments] Clause controls the *appointment* of the members of a typical administrative agency even though its functions, as this Court recognized in *Humphrey's*[10] . . . may be 'predominantly quasi-judicial and quasi-legislative' rather than executive. . . .

**10.** *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935).

In ... *Humphrey's* ..., the Court was careful to note that it was dealing with an agency *intended to be independent of executive authority 'except in its selection.'* ... *Wiener*[11] ... did not question in any respect that members of independent agencies are not independent of the Executive *with respect to their appointments.*" *Buckley, supra* at 136, 96 S.Ct. at 690. (emphasis supplied).

More importantly, this Court's decision simply does not hinge on whether plaintiff is or is not an officer of the United States, and hence on an application of the Appointments Clause. Rather, the important constitutional principle that this case illustrates so well, and which controls the outcome of it, is that the President does not have the power to remove at will certain officers the function and duty of whose office is the exercise of independent judgment and decision-making in and for the District of Columbia.

To return to the federal defendants' argument in this context, they assert that a fixed term of office, imposed by statute, even by the same statute creating the office, never limits by itself the President's power to remove at will the occupant of that office. Only if that office can be pigeonholed as a quasi-legislative or quasi-judicial one, that is, only if it is on all fours with the factual pattern presented in the two leading cases decided by the Supreme Court, *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) and *Wiener v. United States*, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958), would the federal defendants concede that there is any limitation on the President's right to remove at will a presidentially-named official.

This Court concludes that the federal defendants' constitutional argument on the President's "inherent, constitutional power" of removal takes an erroneous view of those cases in its suggestion that, basically, this Court should limit them to their facts. Consideration of those cases suggests, rather, that they establish the principle that

there are some offices that by their nature and function are meant to be independent of control, direction, or interference from the President. At the same time, of course, the great bulk of nonlegislative, nonjudicial officers, by *their* nature and function, *are* meant to do the President's bidding. There can be no doubt, however, that in this unusual case of first impression, the Commission is, in terms of the nature and function of the office, of the small former group.

Demanding complete independence from Presidential direction, it is at least on a par with the Federal Trade Commission in *Humphrey's* or the War Claims Commission in *Wiener*. Indeed, the judicial commissioner may be an *a fortiori* instance of those cases, since there must not be in his case even the appearance of any direction of decision-making from the White House, and since his or her duties extend only to matters involving the District of Columbia, a jurisdiction treated differently by the *Constitution* and with respect to which *Congress* has clearly attempted to extend substantial home rule, and in particular, independence from the federal and presidential direction that had theretofore been the practice. Even though the concept of presidential oversight and direction would seem to be a necessarily included part of the concept of a "purely executive officer," this Court does not understand the federal defendants to contest the view that it would actually be *improper* for the President or any other Executive officer to attempt to oversee or direct any of the decisions of any member of the Commission. Rather, the federal defendants seem to freely concede that *all* the Commissioners, including the President's appointee, should operate entirely independent of the White House. Their brief notes prominently that "the record will not support any suggestion that the President has attempted to undermine the Commission's independence in its evaluation of particular prospective nominees." Federal Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction at 10.

11. *Wiener v. United States*, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958).

The Constitution has very little to say expressly about removal from office that is relevant to this case. As one author has written, "Aside from the reference to impeachment, the Constitution is silent on the subject of removal." [12] Interestingly, though, the Constitution vests the only removal power it mentions—impeachment—in different hands than the appointment of those officials. Article III judges, for instance, appointed by joint action of the President and the Senate, can only be removed by joint action of the Senate and the House. Not only is the Constitution not explicit on most removal matters, but neither were many of the early statutes. Hence, the question arose for the courts of the proper procedures for removing officials. Fairly early, the rule emerged that "in the absence of all constitutional provision or statutory regulation it would seem to be a sound and necessary rule, to consider the power of removal as incident to the power of appointment." *In re Hennen*, 38 U.S. (13 Pet.) 230, 259, 10 L.Ed. 138 (1839) (permitting a district court judge to remove a district court clerk he had appointed). Then, in *Parsons v. United States*, 167 U.S. 324, 17 S.Ct. 880, 42 L.Ed. 185 (1897), the Court ruled that it was proper for the President to discharge a U.S. Attorney he had appointed with the advice and consent of the Senate. To the argument that the statute fixing the term of a U.S. Attorney at four years constituted the sort of "statutory regulation" that would alter *the rule of construction* laid down in *Hennen* for removal at will, the Court held that that particular statute had intended the fixing of the four-year term as words "of limitation and not of grant". *Id.* 167 U.S. at 338, 17 S.Ct. at 885. In other words, the Court concluded that Congress' intent in fixing the term was not to keep U.S. Attorneys independent from direction by the President but apparently to keep them from becoming *too* independent. It is clear

how different the intent of the statute in question in this case is from the statute in *Parsons*. As stated more fully in Part II, *supra*, the intent of this statute was to ensure *complete independence* of Commission members from any presidential direction so that the members could be single-minded in their pursuit and evaluation of merit.

Then in *Reagan v. United States*, 182 U.S. 419, 21 S.Ct. 842, 45 L.Ed. 1162 (1901), the Court upheld the President's dismissal of a U.S. Commissioner in the Indian Territories, because Congress had not conditioned discharge from that office on prescribed "causes." Had Congress done so, however, the Court implied in *Reagan* and other cases decided between *Parsons* and *Myers v. United States*, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926), the President would have to abide by those restrictions on removal even for those who would later be termed "purely executive" officers. Indeed, in *Shurtleff v. United States*, 189 U.S. 311, 23 S.Ct. 535, 47 L.Ed. 828 (1903), the Court, while making clear that its holding was a very limited one that it was proper for the President to remove an appraiser of merchandise for reasons other than those stated in the statute involved in that case, stated in dictum that by using "very clear and explicit language," Congress could limit the President's power to remove even "purely executive" officers like the plaintiff appraiser there.

It was into this background that the lengthy, expansive, dictum-filled opinion in *Myers v. United States, supra*, fell. Justices Holmes, Brandeis, and McReynolds [13] dissented strenuously. Justice Brandeis in dissent took sharp issue with the spirit of *Myers* of vesting the removal power exclusively in the President. In his view not only was there a lack of historical, prece-

---

12. Burkoff, *Appointment and Removal under the Federal Constitution: The Impact of Buckley v. Valeo*, 22 Wayne L.Rev. 1335, 1379 (1976).

13. In his comments from the bench after the announcement of the majority opinion, dissenter Justice McReynolds termed the majority decision "revolutionary." Burkoff, *supra*, at 1404.

dential, and analogical [14] support for a presidential right of removal illimitable by conditions set by Congress, but there was nothing in the doctrine of the separation of powers that "make[s] each branch completely autonomous. [Rather, that doctrine] left each, in some measure, dependent upon the others, as it left to each power to exercise, in some respects, functions in their nature executive, legislative and judicial." *Myers, supra,* 272 U.S. at 291, 47 S.Ct. at 84 (Brandeis, J., dissenting).

The federal defendants would like this Court to read the *Myers* decision broadly. Yet it is quite clear from an analysis of the fairly narrow limits of the actual dispute in *Myers,* and from the subsequent Supreme Court cases of *Humphrey's* and *Wiener* rejecting the bulk of *Myers* as dictum and elaborating a functional approach hinging on the legitimate need for independence from executive control in the nature of certain offices, that indeed *Myers* should be read narrowly. As noted above, *Myers* was a 5–3 decision of a sharply divided Court. *Humphrey's* and *Wiener,* on the other hand, were subsequent unanimous decisions. In retrospect, it is clear that the issue in *Myers* was quite limited. An inferior officer, a postmaster, who was indisputably "purely executive" in the sense that his charge was *not* to be independent of the President or of Executive direction in any way, but rather was clearly meant to be the "eyes and arms of the President", *Humphrey's, supra,* 295 U.S. at 628, 55 S.Ct. at 874, was held to be removable at the will of the President when the President concluded that he was no longer serving well as his "extension". That was so even though a statute sought to tie the President's hands in removing subordinates. The counterargument on the real issue in *Myers,* made pithily by Justice Holmes in his separate dissent, was that if an office, as was the case with the postmastership in *Myers,* "owes its existence to Congress, and ... may [be] abolish[ed] tomorrow [by] Congress," and if "its duration

and the pay attached to it while it lasts depend on Congress alone," and if "Congress alone confers on the President the power to appoint to it and at any time may transfer the power to other hands," then "Congress has power to prescribe a term of life for it free from any interference." *Id.* 272 U.S. at 177, 47 S.Ct. at 46 (Holmes, J., dissenting). Limited by later Supreme Court decisions, *Myers* stands for only this: Even though Congress has established an office, has the power to abolish it, sets its pay and prescribes a desirable duration for it, if that federal office performs purely executive functions, that is, if it is the eyes and arms of the President, then, consistent with the doctrine of the separation of powers, the Congress may not restrict the President in removing the occupants of that office. It is worth noting that the majority opinion's dictum in *Myers exceeded* the position argued by the Solicitor General of the United States *on behalf of the President.* Interestingly, the Solicitor General in *Myers* argued for a "middle position". He urged on the Supreme Court the view that "Congress may guide and direct the discretion of the President by such statutory qualifications as are *properly inherent in the nature of an office,*" but that the nature of Mr. Myers' office as a postmaster was to be merely the eyes and arms of the President and thus it followed that the President could remove Mr. Myers at will. *Myers, supra* 272 U.S. at 96.

In *Humphrey's,* President Roosevelt purported to dismiss Mr. Humphrey less than two years into the latter's seven-year term as a member of an independent regulatory agency, the Federal Trade Commission (FTC). The Congress had made clear in the Act establishing the FTC that the FTC was intended to be "independent of any department of the government." As the Court stated, "the language of the act, the legislative reports, and the general purposes of the legislation as reflected by the debates,

---

**14.** Justice Brandeis analogized the statutory encumbrances or qualifications on the range of presidential *nominees* with what he saw in *Myers* as the analogous situation of statutory encumbrances or qualifications on the range of presidential *removees. Myers, supra,* 272 U.S. at 264–274, 47 S.Ct. at 75–78 (Brandeis, J., dissenting).

all combine to demonstrate the congressional intent to create a body of experts who shall gain experience by length of service; a body which shall be independent of executive authority, *except in its selection,* and free to exercise its judgment without the leave or hindrance of any other official or any department of the government." *Humphrey's, supra,* 295 U.S. at 625–26, 55 S.Ct. at 872–73 (emphasis in original). As this Court noted in discussing the intent and the language of the statute in question in this case, the same is true of its language, its legislative history and its general purposes as the Court said of the FTC Act in *Humphrey's.*

It was likewise clear in *Humphrey's,* as it is undisputed in this case, that the reason for the attempt to dismiss the officeholder was not inefficiency, incompetence, corruption or other "cause".

Though called upon to decide *Humphrey's* less than a decade after *Myers,* the Supreme Court, in a unanimous decision[15] repudiated much of what had been said in *Myers* and held that the President's purported removal of Commissioner Humphrey had been unlawful. On the facts of *Humphrey's,* involving a position on an administrative agency, the Court had occasion to distinguish the quasi-legislative, quasi-judicial *and quasi-executive* FTC from the "eyes and arms of the President" postmaster in *Myers.* The reasoning of the opinion, though, was not that the relevant judicial inquiry is to determine whether an agency from which an officeholder had been removed could be pigeonholed as either an administrative agency or an executive one. Rather, as Justice Frankfurter wrote for a unanimous Court in *Wiener, supra* 357 U.S. at 352, 78 S.Ct. at 1277, in describing the *Humphrey's* reasoning (emphasis supplied):

The assumption was short-lived that the *Myers* case recognized the President's inherent constitutional power to remove

officials, *no matter what the relation of the executive to the discharge of their duties* and no matter what restrictions Congress may have imposed regarding the nature of their tenure.[16]

■ Although given the facts of *Humphrey's* and *Wiener,* it was natural that some have tended to adopt the shorthand of comparing "quasi-legislative" offices with "purely executive" ones, the focus for deciding "whether the power of the President to remove an officer shall prevail over the authority of Congress to condition the power by fixing a definite term and precluding a removal except for cause will depend upon the *character of the office . . . .*" *Humphrey's, supra,* 295 U.S. at 631, 55 S.Ct. at 875. This Court concludes that by that phrase, the Court meant that the following analysis is appropriate. First, the court should determine whether the statute creating the office was designed to ensure those serving in that office independence from executive direction and control. Once the court has determined, as it has in this case, that that was the design of Congress, and that such a design was legitimate, thereby distinguishing the situation under the Tenure in Office Acts involved in *Myers* where a Congress had arrogated the President's power to remove at will subordinates charged with doing his bidding, then the Court should uphold congressional circumscription of presidential removal at will since the "coercive influence" of that power would "threaten . . . *independence.*" *Id.* 295 U.S. at 630, 55 S.Ct. at 875 (emphasis supplied). And again: "[O]ne who holds his office only during the pleasure of another cannot be depended upon to maintain an attitude of *independence* against the latter's will." *Id.* at 629, 55 S.Ct. at 874 (emphasis supplied). Significantly, the *Humphrey's* Court cited with approval dictum in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 162 & 165–66, 2 L.Ed. 60 (1803), where Chief Justice Marshall drew a distinction

---

**15.** Chief Justice Taft was no longer on the Court.

**16.** One commentator wrote of the *Humphrey's* decision that the issue became completely different once the Court faced a case of "office-

holders . . . in positions where direct hierarchical obedience to the President was, to say the least, inappropriate, and most certainly unintended." Burkoff, *supra* at 1405.

between those officers of whom it could legitimately be said that "their acts are his [the President's] acts" and where his will should therefore control, and those officers of whom that could not be said and where, in the interest of giving meaning to independence, removal could be circumscribed. Finally, it was clear in *Humphrey's*, as it later was in *Wiener*, that the President had no inherent constitutional power, flowing from either the Appointments Clause or the duty to faithfully execute the laws of the United States, to remove officials serving in offices intended to be independent from Executive direction, control or influence.

*Wiener* presented a situation fairly akin to the one in *Humphrey's*, and produced a second unanimous holding invalidating a President's purported removal of an official meant to be independent of the Executive Branch. The case is particularly significant since it was the Court's last word on the subject of removal of officials meant to be independent, since it further repudiated any idea of reading *Myers* expansively, and since it involved a situation where, as in this case but unlike in *Humphrey's*, Congress had *not* specified anything *in the statute* establishing and structuring the War Claims Commission about the grounds for removal. As is the case with the statutes in question here then, the Court should not assume that Congress meant thereby to leave the matter to, or to recognize, an inherent constitutional power to remove a Commissioner at will. Rather, a unanimous Court instructed, the proper judicial response to the lack of express language in the statute, in a removal case, is to determine from the statute, the legislative history, and the general purpose of the legislation "the nature of the function that Congress vested in the . . . Commission." *Wiener, supra* 357 U.S. at 353, 78 S.Ct. at

1278. Hence, the Court invalidated President Eisenhower's purported dismissal of a member of the War Claims Commission who was to serve until the Commission wound up its business of "receiv[ing] and adjudicat[ing] according to law" claims for compensating internees, prisoners of war, and religious organizations which had suffered harm at the hands of the enemy in connection with World War II. Under the Act establishing the Commission [17] the task of distributing funds from the Treasury for that compensatory purpose was given to a Commission "established as an adjudicating body with all the paraphernalia by which legal claims are put to the test of proof, with finality of determination. . . ." *Id.* Again, as in *Humphrey's*, because of the facts of the particular case before the Court, comment has naturally revolved around a "quasi-judicial" agency. But in again dismissing *Myers* unanimously as having had its "scope" "narrowly confined" "to include only 'all purely executive officers,' " *id.* 357 U.S. at 352, 78 S.Ct. at 1277, and in again stressing independence, the Court made clear that the crucial consideration was that the statutory scheme had sought to ensure the *independence* of a Commission that Congress had created, and that it was legitimate for Congress to have made that office independent. As the Court put in in its conclusion in *Wiener*, Congress set up "a body that was [to be] 'entirely free from the control or coercive influence, direct or indirect,' [citing *Humphrey's, supra*, 295 U.S. at 629, 55 S.Ct. at 874] of either the Executive or the Congress."

If, as one must take for granted, the War Claims Act precluded the President from influencing the Commission in passing on a particular claim, *a fortiori* must it be inferred that Congress did not wish to

**17.** The Court noted the legislative history and made some comments about it which are interesting for this Court's situation. The Court explained that the House had originally vested that task or a part of it in a federal security administrator. *Id.* at 354, 78 S.Ct. at 1278. The Court referred to such an administrator as "indubitably an arm of the President," whom the President could have therefore discharged at will if the President disagreed with his performance of that task. However, the Senate rewrote the bill in the form which, in substance, passed. Because further duties, requiring independence and not being the eyes and arms of the President, had been added to the Commission's tasks, Commissioners could *not* be removed at will by the President.

have hang over the Commission the Damocles' sword of removal by the President for no reason other than that he preferred to have on that Commission men of his own choosing.

*Id.* 357 U.S. at 355–56, 78 S.Ct. at 1279. And again a unanimous Court left little doubt that since the concern was preservation of legitimate independence, the analytical mode should not be pigeonholing, but rather the "philosophy" of the cases and their implications. Commentators on what was to become the Supreme Court's last pronouncement on this subject, recognized the demise of technical considerations and particularly of *Myers*, and the centrality to the inquiry of whether there is a legitimate need for independence in the functioning of an agency or commission whose member(s) the President seeks to remove at will. As the *Harvard Law Review* commented in its annual summary of the Court Term: [18]

The Government, in support of its position that the members of the War Claims Commission performed "purely executive" functions, contended that the settlement of claims against foreign nations had traditionally been an executive function, related to the power to conduct foreign affairs. The Court, however, indicated that Congress could have given the Commission's function to any branch of the Government. * * * [In sum, the statute] involved in [*Myers*] was enacted in a period of extreme antagonism between Congress and the President and seemed to be aimed only at undermining the position of the President. It seems likely that *if a congressional restriction of the President's power to discharge government officials other than high policy-making officials is designed to achieve a purpose reasonably related to the sound administration of the Government, it will*

*be sustained.* Only in the extremely rare instance of clear congressional abuse would the constitutional limitation of the *Myers* case be applied.

Note, *The Supreme Court Term, 1957 Term,* 72 Harv.L.Rev. at 165–66 (1958) (emphasis the Court's).[19]

## IV

### *The District of Columbia Aspect of this Case*

In Part III this Court concluded that the philosophy and the implications of the *Myers-Humphrey's-Wiener* trilogy of cases support the conclusion that the paramount interest in independence that Congress legitimately mandated as the function and duty of a member of the Commission limits the President's power of removal at will of any such commissioner. That conclusion is reinforced by the circumstance that this case involves Congress' expansive role in managing affairs in the District of Columbia that the Constitution specifically and expressly grants to Congress. The Constitution, art. I, sec. 8, cl. 17 reads in pertinent part:

The Congress shall have power . . . [t]o exercise exclusive Legislation in all Cases whatsoever, over such District . . . as may . . . become the Seat of the Government of the United States. . . .

Two arguments, both favoring the position of the plaintiff, emerge from that express grant of exclusive legislative control over all matters whatsoever involving the District. The first argument goes to appointment, the second, on which this Court relies, goes to removal, the real issue presented by this case.

With respect to the first argument, separation of powers *notions* are an underlying

---

**18.** A later commentator wrote:

Where the *Myers* Court leaned over backwards to accommodate the President, the *Wiener* Court was unwilling, even in the total absence of explicit congressional expression on point, to give the President a removal power that went beyond the Court's conception of the degree of independence from the executive branch necessary to insure the via-

bility of particular agencies or individuals. Burkoff, *supra* at 1410.

**19.** The Court has considered *Martin v. Tobin,* 451 F.2d 1335 (9th Cir. 1971), *Lewis v. Carter,* 436 F.Supp. 958 (D.D.C.1977) and *Nader v. Bork,* 366 F.Supp. 104 (D.D.C.1973), and finds they are distinguishable.

concept of constitutional interpretation, but the main contours of the separation of powers are shaped by the express language of the Constitution. In this case, there is express language granting Congress power to exercise exclusive legislation over all matters involving the District. On the other hand, the Constitution has little to say expressly or by necessary implication about officials who are to perform functions relating entirely to the local government of the District.[20] The Constitution appears to contemplate a larger role for the Congress in managing the District than is the case with the more equal sharing the Constitution speaks of for managing federal matters and the federal government. Considering, therefore, the vesting of somewhat greater powers in the Congress for District than for federal matters by virtue of Clause 17, it may be that the Congress could set up a Commission that would actually make all personnel decisions, subject to the advice and consent of the Senate, for posts in the District, though such a role for a Commission would be impermissible in making similar personnel decisions for *federal* rather than District posts.

The federal defendants counter that Clause 17 should be construed as a grant not of exclusivity to Congress rather than the Executive, but rather solely of exclusivity to Congress rather than the state legislatures of the States (Maryland and Virginia) that were to cede the territory to comprise the District. However, the cases do not support the view that the *only* aim of Clause 17 was to dispose of state/federal

jurisdictional disputes, or that it was completely unconcerned with the allocation of federal power between the Executive and the Congress over the District. The federal defendants also argue that it is dispositive of this issue that Clause 17 speaks of "exclusive Legislation" and not the "exclusive jurisdiction" for which, they claim, the plaintiff is arguing. However, as suggested above there may not be a conflict between exclusive *legislative power* and the *power to appoint District of Columbia local officials.* While in *Buckley, supra,* the Court did state that the Congress' agents could not appoint federal officers charged with interpretation and enforcement of a complex nationwide regulatory statute, that case does not necessarily dispose of this issue since this case involves District officials and must be considered in light of Clause 17. Likewise, *Buckley* seems distinguishable because unlike the mandate of the Federal Election Commission to administer a complex federal statute which had nationwide sweep and impact the judicial Commission's mandate is independent decision-making restricted entirely to local matters. Moreover, *Buckley* is probably also distinguishable since *four of the six* Federal Election Commissioners were appointed *directly by Congress* (two each by the Speaker and the President *pro tempore* of the Senate), whereas here no Commissioner is appointed by the Congress or even by anyone over whom Congress has control.

An apt comparison[21] is the practice with respect to the territories of the United

---

**20.** *See Chadha v. INS,* 634 F.2d 408, 421, 425 (9th Cir. 1980):

As James Madison affirmed in the beginning, the separation of powers concept is neither doctrinaire nor rigid. * * * The doctrine is at once pervasive and fluid. * * * Professor, later Justice, Frankfurter, explained this point ["the primacy of the Legislative branch in organizing the Government"].

The accommodations among the three branches of the government are not automatic. They are undefined, and in the very nature of things could not have been defined, by the Constitution. To speak of *lines* of demarcation is to use an inapt figure. There are vast stretches of ambiguous territory. Cer-

tainly in the first instance Congress must mark metes and bounds.

**21.** Comparison of the law applied to the territories with the law applied to the District is particularly apt. *District of Columbia v. John R. Thompson Co.,* 346 U.S. 100, 105, 73 S.Ct. 1007, 1010, 97 L.Ed. 1480 (1953) ("The analogy [between a former statutory scheme of management for the District and that for the territorial governments] is an apt one"). The Court went on to note that "the power of Congress over the District and its power over the Territories are phrased in very similar language in the Constitution." *Id.* at 105–06, 73 S.Ct. at 1010.

Appendix A to this opinion addresses the inquiry of the general state practice with respect to the appointment of agency heads.

States. Territorial cases provide ample examples of the permissibility of congressional establishment of schemes of local government which, were they adopted for the federal government or in the administration of uniform nationwide regulation, would likely have been invalidated. *See, e. g. Snow v. United States*, 85 U.S. (18 Wall.) 317, 21 L.Ed. 784 (1873). There the territorial legislature established by Congress, appointed the District Attorney of the Territory. A criminal defendant challenged his prosecution by the legislatively appointed District Attorney on separation of powers grounds. The Supreme Court held that the prosecution, and the authority and the process of selecting the District Attorney, were valid. *See also Maynard v. Hill*, 125 U.S. 190, 8 S.Ct. 723, 31 L.Ed. 654 (1888), where the Court upheld a divorce granted by the territorial legislature of Oregon, as a proper exercise of the legislative power of the Territory "extend[ing] to all rightful subjects of legislation," and not inconsistent with the Constitution and laws of the United States. *Id.* at 204, 8 S.Ct. at 726. The Court stated:

> Even though agency heads are more executive-type officials than are involved in this case, 39 States vest the appointment of one or more agency heads in a Commission or Board. Eight States vest the appointment of one or more such heads in the state legislature itself. Perhaps most significantly, *no* State follows the federal model of Executive (i. e. gubernatorial) nomination for all its state agency heads.

**22.** *Cf. Chadha, supra*, at 424 (emphasis the Court's):

> In contrast to . . . minor departures from the norm, there are departures that are *axiomatically unconstitutional*, departures which undermine the . . . purpose[s] of the separation of powers doctrine. Examples would be an attempt by the Executive to enact a federal criminal code without congressional approval, or an attempt by Congress to exercise the prosecutorial and adjudicative responsibilities of enforcing the criminal law. No doubt all would agree that these schemes would violate the Constitution.

**23.** The cases decided under Clause 17 have held that "the power of the Congress over the District of Columbia relates . . . to 'all the powers of legislation which may be exercised by a state in dealing with its affairs,'" and have noted that "there is no reason why a state, if it so chooses, may not fashion its basic law so as to grant home rule or self-government. . . . "

What were "rightful subjects of legislation" when these acts organizing the Territories were passed, is not to be settled by reference to the distinctions usually made between legislative acts and such as are judicial or administrative in their character, but by an examination of the subjects upon which legislatures had been in the practice of acting with the consent and approval of the people they represented.

*Id.* at 204, 8 S.Ct. at 726.

The territorial cases stand for the proposition that a scheme of government for an entity under Congress' exclusive legislative power is not unconstitutional merely because it diverges from the federal model of the separation of powers. Rather if the scheme is not out of all proportion with the federal model,[22] and if it appears to be a reasonable means of achieving a particular governmental goal, then "the legislative power" of Congress (or the territorial legislature) could extend as far as the general practice of the *state* legislatures.[23]

> *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 108, 73 S.Ct. 1007, 1012, 97 L.Ed. 1480 (1953). *See also Metropolitan R. R. Co. v. District of Columbia*, 132 U.S. 1, 8, 10 S.Ct. 19, 22, 33 L.Ed. 231 (1889) (emphasis supplied) in which the Court stated:
>
>> The form of [local District of Columbia] agencies and the mode of appointing officials to execute them are matters of legislative discretion. *Commissioners are not unfrequently appointed by the legislature* or executive of a State for the administration of municipal affairs, or some portion thereof, sometimes temporarily, sometimes permanently.
>
> For cases deferring to and upholding Congress' power to establish the judicial system of the District of Columbia as it sees fit, *see Palmore v. United States*, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973), and *Capital Traction Co. v. Hof*, 174 U.S. 1, 5, 19 S.Ct. 580, 582, 43 L.Ed. 873 (1899):
>
>> I. The Congress of the United States, being empowered by the Constitution "to exercise exclusive legislation in all cases whatsoever" over the seat of the National Government, has the entire control over the District of Columbia for every purpose of government, national or local. It may exercise within the District all legislative powers that the legislature of a State might exercise with-

## V

In the final analysis, and notwithstanding the federal defendants' characterization, removal, not appointment, is the issue here. Appointment is only before the Court in the following limited way. In its analysis the Court is called upon to determine the basic nature and function of the Commission. The Commission's primary mandate and function is to make an independent investigation and assessment of merit concerning candidates for judicial appointments in the prestigious local courts of the Nation's capital. Though those candidates come from different political parties, professional backgrounds, ideologies, and ethnic and racial groups, the Commission's call is to rise above political or philosophical considerations and any other prejudices of the moment. Commissioners are to focus single-mindedly on merit, and to send a list of those three persons deemed to possess the greatest merit along to the President. It was to ensure the independence of that investigative and decision-making process in an area that Congress deemed to have too often in the past been subjected to political pressures and other nonmerit considerations that Congress set up the Commission and sought to insulate all of its members.

■ The real importance of the foregoing analysis of Clause 17 and a review of the territorial and District cases is not for what they imply about *appointment* but for what they imply about *removal*, the issue in this case. The point is simply: Whatever may be the law on removal at will by the President of officials of an agency or commission that Congress legitimately intends to be not the eyes and arms of the President in doing his bidding, but rather to operate insulated from any direction by him in order to engage in independent decision-making, and whatever may be the law on appointment not to federal offices but to ones in the District of Columbia, both strands meet in this case and cause the Court to conclude that the plaintiff has been removed impermissibly.

■ Clause 17, in expressly granting to the Congress exclusive legislative power over all matters whatsoever involving the District of Columbia, suggests strongly that this congressional design to give meaning to the independent nature of certain functions exclusively related to the District of Columbia by limiting removal at will of the officials performing those functions is legitimate. It is a proper legislative function, at least where Clause 17 comes into play, to establish conditions for removal, whether to establish certain "causes" as the only grounds for removal or to set a fixed term and other insulating protections, in order to foster the independent decisionmaking entrusted to a certain commission, and Congress has done so for this office in and for the District.

It may be that courts should give effect to any statute clearly intended to limit removal at will by the President of any of-

in the State; and may vest and distribute the judicial authority in and among courts and magistrates, and regulate judicial proceedings before them, as it may think fit, so long as it does not contravene any provision of the Constitution of the United States.

See also 1973 *D.C.Code Leg. & Adm.Service* 561–71 (Appendix C to the legislative history of P.L. 93–198, entitled "A Statutory History of the Judicial System of the District of Columbia: 1801–1973," including, *inter alia*, a number of instances where Congress conditioned the removal of certain officers, whose duties were confined to the District of Columbia, for example:

The act of June 7, 1878 also provided for the appointment by the Supreme Court of the District of Columbia of constables, not exceeding twenty in number, to serve for four years subject to removal by the Court for "willful violation of law, or for misconduct, or for incompetency.")

On the other hand where Congress has intended to grant the President power to remove at will a District of Columbia local official, it has shown that it knows how to express that intention:

The act of June 7, 1878 further provided for the appointment by the President of the United States of "as many commissioners of deeds" and "notaries public" in the District of Columbia "as he may deem necessary," all of whom were to hold their offices for four year terms and be "removable by discretion" from office.

ficeholder who is not, by virtue of the function and duties of his office, the eyes and arms of the President. The Court, however, believes that this case presents a narrower issue, since it involves the holder of an office with duties confined exclusively to local District of Columbia matters.

In sum, the Court must reject both of the principal lines of argument of the federal defendants. With respect to the defense that the statute does not intend to limit removal at will by the President of District of Columbia judicial commissioners, or at least the federal commissioner appointed by the President, the Court finds that the statutory intent was that *no* Commissioner should serve at the pleasure of his or her appointer. With respect to the constitutional defense, which this Court must reach, the Court concludes that the statutory limitation on removal (signed into law by the President) does not violate the doctrine of the separation of powers. It is not an inherently or necessarily executive function to remove at will Commissioners 1) whose sole function and duty is to exercise independent decision-making on merit qualifications, *and* 2) whose duties are confined exclusively to local District of Columbia matters. Where both those elements are present, statutes such as those involved in this case may constitutionally circumscribe removal at will.

As Justice Frankfurter has written: "There are vast stretches of ambiguous territory" between the powers of one branch and those of another in the constitutional design. Frankfurter & Landis, *Power of Congress over Procedure in Criminal Con-* tempts in "Inferior" Federal Courts—A Study in Separation of Powers, 37 Harv.L. Rev. 1010, 1014 (1924). The unanimous *Humphrey's* decision acknowledged that there "remain[ed] a field of doubt" between the implications of *Myers* and those of *Humphrey's*. *Humphrey's, supra*, 295 U.S. at 632, 55 S.Ct. at 875. *See also Soucie v. David*, 145 U.S.App.D.C. 144, 149, 448 F.2d 1067, 1072 n. 11 (1971) (Supreme Court has drawn "an uncertain distinction").

This Court certainly agrees that it is hard to draw that line where Congress begins to usurp Executive functions. Wherever that line is, though, for general federal matters, this Court concludes that it is somewhat further over in a case where Congress has legislated for purely local District of Columbia matters.[24] Since Congress has not crossed that line in the circumstances of this case, the federal defendants' constitutional defense must fail. Accordingly, since the statutory intent is clear that the President cannot remove plaintiff at will, the Court concludes that the purported removal here was invalid, and that the plaintiff, since he has neither completed the statutorily-fixed term, resigned nor been removed for cause, is still a member of the District of Columbia Judicial Nomination Commission. Since he has, therefore, been a member of that Commission throughout the entire period since his appointment, the federal presidentially-appointed slot on the Commission was not vacant when President Reagan purported to name federal defendant Lacovara to it. Accordingly, that "appointment" was null and void and of no legal effect.

---

**24.** *See Halleck v. Berliner*, 427 F.Supp. 1225, 1233 (D.D.C.1977):

Under Art. I, § 8, cl. 17, Congress has the power to legislate for the District of Columbia. That power is plenary, .... In the exercise of that power Congress has created for the District of Columbia a local govern- mental structure, including a local court system, analogous to that of a state. * * * It is doubtful whether the doctrine of separation of powers applies with the same force to the governmental structure of the District of Columbia as it does to the federal Government.

## APPENDIX A

Method of Appointment—Selected Agency Heads

| State | By Gov. | By Gov. with confirmation | By Agency or Bd. with consent of Governor | By Agency Head | By Bd. or Commission | Elected | By Legislature | Miscellaneous | Total Reported (28 max.) * |
|---|---|---|---|---|---|---|---|---|---|
| Alabama | 10 | 1 | | 2 | 7 | 5 | | 2 | 27 |
| Alaska | | 13 | | 12 | | | | | 25 |
| Arizona | 3 | 6 | 1 | 4 | 9 | 4 | | | 27 |
| Arkansas | 4 | 4 | 13 | | 2 | 3 | | | 26 |
| California | 1 | 18 | | | | 5 | | 2 | 26 |
| Colorado | 1 | 10 | | | 1 | 3 | | 12 | 27 |
| Connecticut | 3 | 14 | 3 | | 3 | 4 | | 1 | 28 |
| Delaware | | 15 | 7 | 1 | 1 | 3 | | | 27 |
| Florida | | 12 | | 5 | | 7 | | 2 | 26 |
| Georgia | 4 | 3 | | 2 | 6 | 7 | | 6 | 28 |
| Hawaii | | 18 | | 1 | 1 | | | | 20 |
| Idaho | | 18 | | 1 | 4 | 4 | | | 27 |
| Illinois | 1 | 20 | | 2 | | 4 | | | 27 |
| Indiana | 18 | | 1 | | | 4 | | 2 | 25 |
| Iowa | 2 | 13 | | 2 | 4 | 4 | | 1 | 26 |
| Kansas | 6 | 2 | 5 | 2 | 2 | 4 | | 4 | 25 |
| Kentucky | 15 | 1 | 5 | | 1 | 5 | | | 27 |
| Louisiana | 7 | 6 | | 3 | 4 | 8 | | | 28 |
| Maine | 2 | 12 | 5 | 2 | 2 | | 3 | | 26 |
| Maryland | 1 | 9 | 6 | 1 | 2 | 2 | 1 | 1 | 23 |
| Massachusetts | 19 | | 4 | | 1 | 3 | | | 27 |
| Michigan | 2 | 10 | | 2 | 6 | 2 | | 4 | 26 |
| Minnesota | 3 | 13 | | 5 | 3 | 3 | | | 27 |
| Mississippi | 5 | 4 | | | 7 | 9 | | | 25 |
| Missouri | 2 | 17 | 1 | | 5 | 3 | | | 28 |
| Montana | 8 | 5 | 1 | 2 | | 4 | 1 | 6 | 27 |
| Nebraska | 6 | 11 | 1 | | 3 | 4 | | | 25 |
| Nevada | 9 | | 7 | 1 | 6 | 4 | | | 27 |
| New Hampshire | 2 | 13 | 6 | | 1 | | 2 | 3 | 27 |
| New Jersey | 1 | 19 | 1 | 3 | | | | 1 | 25 |
| New Mexico | 6 | 5 | | 2 | 9 | 3 | | | 25 |
| New York | 3 | 16 | | 4 | 1 | 2 | | | 26 |
| North Carolina | 12 | 1 | 5 | 2 | 1 | 7 | | | 28 |
| North Dakota | 11 | 1 | 1 | 3 | 1 | 9 | | 1 | 27 |
| Ohio | 1 | 15 | | 6 | 1 | 3 | | | 26 |
| Oklahoma | 2 | 7 | | | 10 | 7 | | | 26 |
| Oregon | 13 | 3 | | | 4 | 5 | | | 25 |
| Pennsylvania | 4 | 20 | 1 | | | 2 | | | 27 |
| Rhode Island | 10 | 10 | | | | 3 | | 3 | 26 |
| South Carolina | | 5 | | | 14 | 7 | 2 | | 28 |
| South Dakota | 6 | 9 | | 1 | 3 | 5 | | | 24 |
| Tennessee | 19 | | | 5 | | 1 | 2 | 1 | 28 |
| Texas | 3 | 2 | | 1 | 13 | 5 | | | 24 |
| Utah | 3 | 10 | 9 | | 2 | 3 | | | 27 |
| Vermont | 3 | 12 | 6 | | | 3 | 1 | | 25 |
| Virginia | 5 | 17 | | | 2 | 1 | 1 | | 26 |
| Washington | 3 | 12 | | 4 | 1 | 6 | | | 26 |
| West Virginia | 2 | 15 | | 3 | 2 | 4 | | | 26 |
| Wisconsin | 2 | 9 | | 2 | 4 | 4 | | 6 | 27 |
| Wyoming | 9 | 2 | 4 | 3 | 4 | 3 | | | 26 |

* The positions covered are: secretary of state, attorney general, adjutant general, treasurer, controller, & heads of the following functions: revenue, finance administration, budget, planning, personnel, public works & buildings, central purchasing, public instruction, health, mental health, welfare, employment security, corrections, conservation, agriculture, highways, police public safety, civil defense, labor, commerce, banking, insurance & public utility regulation.

H. Linde & G. Bunn, *Legislative and Administrative Processes* (1976) at 655.