## PARSONS v. UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 270.   Argued April 8, 9, 1897. — Decided May 24, 1897.

The President has power to remove a district attorney of the United States, when such removal occurs within four years from the date of the attorney's appointment, and, with the advice and consent of the Senate, to appoint a successor to him.

Section 769 of the Revised Statutes which enacts that "district attorneys shall be appointed for a term of four years and their commissions shall cease and expire at the expiration of four years from their respective dates" provides that the term shall not last longer than four years, subject to the right of the President to sooner remove.

It was the purpose of Congress, in the repeal of the tenure of office sections of the Revised Statutes, to again concede to the President the power of removal, if taken from him by the original tenure of office act, and, by reason of the repeal, to thereby enable him to remove an officer when in his discretion he regards it for the public good, although the term of office may have been limited by the words of the statute creating the office.

The legislative, executive and judicial history of the question reviewed.

THE appellant, on the 4th day of December, 1894, filed in the Court of Claims an amended petition, in which he alleged that on the 4th of February, 1890, after his nomination and confirmation, he was duly appointed, qualified and commissioned for the term of four years as attorney for the United States for the Northern District of Alabama, and also to act as such for the Middle District of Alabama; that thereupon he entered upon the discharge of the duties of his office; that he never resigned the same, and that he then resided, and has continued to reside, since the date of his commission, in the city of Birmingham, Alabama, and within the Northern District of Alabama, and that he had given his personal attention to the duties of his office, and that no cause of removal had existed since his appointment.

Although the appellant was, as he alleged, duly commissioned as such district attorney, the contents of the commission do not appear in the petition nor in the record, but it has

been assumed that it contained the usual language, which, after authorizing and empowering the officer to execute and fulfil the duties ·of the office, proceeds as follows : " To have and to hold the said office with all the powers, privileges and emoluments to the same of right appertaining unto him, the said Lewis E. Parsons, Jr., for the term of four years from the date hereof, subject to the conditions prescribed by law."

It was further alleged in the petition that on the 29th day of May, 1893, the appellant received a written communication from the President of the United States as follows :

"Executive Mansion,
"*Washington, D. C., May* 26, 1893.

"Sir: You are hereby removed from the office of attorney of the United States for the Northern and Middle Districts of Alabama, to take effect upon the appointment and qualification of your successor.

"Grover Cleveland.

"To Lewis E. Parsons, Jr.,
"*Birmingham, Ala.*"

No charges had been preferred against the appellant.

Under date of Birmingham, Alabama, June 5, 1893, he sent a written communication to the President of the United States, at Washington, D. C., in which he said :

"My commission bears date February 4, 1890, and authorizes me to hold said office for the definite term of four years from the date thereof, fixed by law, and I am advised by counsel, and it is my own opinion, that you have no power to remove me, and I respectfully decline to surrender the office.

"Very respectfully,
"Lewis E. Parsons, Jr.,
"*United States Attorney for the Northern District of Alabama.*"

This answer was duly mailed to the President of the United States, and on the same day, viz., the 5th day of June, 1893,

the appellant notified both the Attorney General of the United States and Emmet O'Neal that he declined to surrender the office of attorney of the United States for the Northern District of Alabama to said O'Neal, who was named by the President as appellant's successor, his (O'Neal's) appointment bearing date May 26, 1893.

Upon the 20th day of June, 1893, O'Neal moved the Circuit Court for the Southern Division of the Northern District of Alabama to require appellant to turn over to him all the books and papers and other property appertaining to the office, which motion was resisted by appellant, but was granted by the court, although it did not adjudicate or determine the question of the title to the office, or the power of the President to remove the appellant. *In re O'Neal*, 57 Fed. Rep. 293.

The appellant applied to this court for leave to file a petition for a writ of mandamus to compel the judge to vacate his order granting the motion of Mr. O'Neal, which application was denied, but the merits of the case were not passed upon. *In re Parsons, Petitioner*, 150 U. S. 150.

The appellant further alleged in his petition that from the first of January, 1893, to May 26 of that year he had earned certain fees, which had been duly accounted for and approved by the District Judge, and that since the 26th of May, and prior to the 31st day of December, 1893, certain other fees had been earned for services rendered by Mr. O'Neal, who had been performing the duties of United States attorney since the 26th of May, 1893, and that on the whole there was a balance due appellant for salary and fees during the year 1893, appertaining to his office as district attorney, which amount had been demanded by appellant and payment had been refused. Judgment for the amount was demanded.

The usual answer was put in by the United States. It further appears that on the 26th of May, 1893, the Senate of the United States was not in session, but that in August, 1893, that body was in session, and that the nomination of Mr. O'Neal was sent to it, and his appointment was by it consented to and confirmed, and that he was commissioned as United States district attorney for four years from that time. These facts have

not been stated in the formal finding of facts by the court below, but they have been referred to by both the counsel in their briefs in the case as part of the admitted facts, and the fact of the confirmation of Mr. O'Neal on the 26th day of August, 1893, by the Senate, is stated by Judge Weldon in the course of his opinion in this case. 30 C. Cl. 222. The court below determined, as a conclusion of law, that the appellant was not entitled to recover, and his petition was therefore dismissed. From that judgment he has appealed to this court.

*Mr. J. A. W. Smith* and *Mr. L. T. Michener* for appellant. *Mr. D. D. Shelby*, *Mr. J. H. Parsons, Jr.*, *Mr. W. W. Dudley* and *Mr. R. R. McMahon* were on their brief.

*Mr. Assistant Attorney General Dodge* for appellees.

MR. JUSTICE PECKHAM, after stating the facts, delivered the opinion of the court.

The question here presented is whether the President of the United States has power to remove a district attorney, who had been duly appointed, when such removal occurs within the period of four years from the date of his appointment, and to appoint a successor to that officer by and with the advice and consent of the Senate. The appellant in this case claims that the President has no such power, and that by virtue of the appointment of appellant to the office of district attorney in February, 1890, he was entitled to hold that office for four years from that date, and to receive the emoluments appertaining thereto during the same period. He bases his claim upon sections 767 and 769 of the Revised Statutes.

Section 767 provides for the appointment in each district of the United States, with the exceptions therein stated, of "a person learned in the law to act as attorney for the United States in such district."

Section 769 reads as follows:

"District attorneys shall be appointed for a term of four

years and their commissions shall cease and expire at the expiration of four years from their respective dates. And every district attorney, before entering upon his office, shall be sworn to the faithful execution thereof."

The appellant claims that this section gives to every district attorney the legal right to hold his office for four years, and that during that time the President has no power to remove him directly, and the President and Senate have no power to remove him indirectly by the appointment of a successor, and that, therefore, he has never been legally removed, and he bases his claim to recover herein upon that fact.

The first question which arises is in regard to the proper construction of the above-quoted section. Does it provide for the continuance in office for four years at all events and for a termination at the expiration of that period, or does it mean to provide that the term shall not last longer than four years, subject to the right of the President to sooner remove? If it were to be construed in accordance with the claim of appellant, the further question would then arise whether a statute which fixed a term of office for a district attorney, during the running of which neither the President, nor the President and Senate by the appointment of a successor, should have power to remove the incumbent from office would be constitutional.

It will greatly aid us in giving the proper construction to this section if we look for a moment at the constitutional history of the subject relating to the President's power of removal and at the debates which have taken place in Congress in regard to it. The question arose in the first session of the first Congress which met after the adoption of the Constitution.

On the 19th of May, 1789, in the House of Representatives, Mr. Madison moved "That it is the opinion of this committee that there shall be established an executive department, to be denominated the department of foreign affairs; at the head of which there shall be an officer to be called the secretary of the department of foreign affairs, who shall be appointed by the President by and with the advice and consent of the Senate; and to be removable by the President." Subse-

quently a bill was introduced embodying those provisions. Mr. Smith of South Carolina said that "He had doubts whether the officer could be removed by the President; he apprehended that he could only be removed by an impeachment before the Senate, and that being once in office he must remain there until convicted upon impeachment; and he wished gentlemen would consider this point well before deciding it." 1st Lloyd's Cong. Reg. pp. 350, 351. Then ensued what has been many times described as one of the ablest constitutional debates which has taken place in Congress since the adoption of the Constitution. It lasted for many days, and all arguments that could be thought of by men — many of whom had been instrumental in the preparation and adoption of the Constitution — were brought forward in debate in favor of or against that construction of the instrument which reposed in the President alone the power to remove from office.

After a most exhaustive debate the House refused to adopt the motion which had been made to strike out the words " to be removed from office by the President," but subsequently the bill was amended by inserting a provision that there should be a clerk to be appointed by the secretary, etc., and that said clerk, " whenever said principal officer shall be removed from office by the President of the United States, or in any other case of a vacancy," shall be the custodian of the records, etc., and thereupon the first clause, " that the secretary should be removable from office by the President," was stricken out, but it was on the well understood ground that the amendment sufficiently embodied the construction of the Constitution given to it by Mr. Madison and those who agreed with him, and that it was at the same time free from the objection to the clause so stricken out that it was itself susceptible to the objection of undertaking to confer upon the President a power which before he had not. The bill so amended was sent to the Senate, and was finally passed after a long and able debate by that body, without any amendments on this particular subject. The Senate was, however, equally divided upon it, and the question was decided in favor of the bill by

the casting vote of Mr. Adams, as Vice President. Mr. Charles Francis Adams, in the Life of John Adams (vol. 2, p. 143), in speaking of this action of the Vice President, says:

"It was the only time, during his eight years of service in that place that he felt the case to be of such importance as to justify his assigning reasons for his vote. These reasons were not committed to paper, however, and can therefore never be known. But in their soundness it is certain that he never had the shadow of a doubt. His decision settled the question of constitutional power in favor of the President, and consequently established the practice under the government which has continued down to this day.

"Although there have been occasional exceptions taken to it in argument, especially in moments when the executive power, wielded by a strong hand, seemed to encroach upon the limits of the coördinate departments, its substantial correctness has been, on the whole, quite generally acquiesced in. And all have agreed that no single act of the first Congress has been attended with more important effect upon the working of every part of the government."

Many distinguished lawyers originally had very different opinions in regard to this power from the one arrived at by this Congress, but when the question was alluded to in after years they recognized that the decision of Congress in 1789, and the universal practice of the Government under it, had settled the question beyond any power of alteration. (To this effect see Kent's Com. vol. 1, Lec. 14, p. 310, subject, U. S. Marshals; Story on the Const. vol. 2, §§ 1542–1544.)

In the subsequent debates in Congress over the removal of the deposits of the Government, by direction of the President, from the Bank of the United States, and the dismissal by the President of the Secretary of the Treasury, Mr. Duane, as a means to accomplish that purpose, the subject of the power of the President to remove from office was alluded to by Mr. Webster, and he admitted the proposition that the President had the power of removal. Although as an original question he would have had a different opinion, yet in view of the action of Congress and the practice of the Government he said:

" I regard it as a settled point, settled by construction, settled by precedent, settled by the practice of the Government, settled by legislation"; and he did not ask to disturb it. In speaking on that subject, and referring to Mr. Webster's admission, Mr. Evarts, upon the trial of President Johnson, said: " He knew the force of those forty-five years, the whole existence of the nation under its Constitution, upon a question of that kind; and he sought only to interpose a moral restraint upon the President, in requiring him, when he removed from office, to assign the reasons of the removal." (Johnson's Impeachment Trial, vol. 2, p. 314, remarks of Mr. William M. Evarts, of counsel for the President.)

In *In re Hennen,* 13 Pet. 230, 259, which was a case involving the validity of an appointment of a clerk of the District Court of Louisiana by the District Judge thereof, it was said, by Mr. Justice Thompson, in speaking of the power of removal:

" In the absence of all constitutional provision, or statutory regulation, it would seem to be a sound and necessary rule to consider the power of removal as incident to the power of appointment. This power of removal from office was a subject much disputed, and upon which a great diversity of opinion was entertained in the early history of this government. This related, however, to the power of the President to remove officers appointed with the concurrence of the Senate; and the great question was, whether the removal was to be by the President alone or with the concurrence of the Senate, both constituting the appointing power. No one denied the power of the President and Senate, jointly, to remove, where the tenure of the office was not fixed by the Constitution; which was a full recognition of the principle that the power of removal was incident to the power of appointment. But it was very early adopted, as the practical construction of the Constitution, that this power was vested in the President alone. And such would appear to have been the legislative construction of the Constitution."

And in speaking of the different language employed in the act establishing the Navy Department from that which was

used in regard to the Department of State, the learned justice further remarked: "The change of phraseology arose, probably, from its having become the settled and well understood construction of the Constitution that the power of removal was vested in the President alone, in such cases, although the appointment of the officer was by the President and Senate."

The opinions of the law officers of the Government have been in harmony with the foregoing views.

In 1847, Attorney General Clifford, subsequently and for many years one of the justices of this court, in the course of an opinion given in regard to the claim of Surgeon Du Barry for back pay, in speaking of this power of the President and the acquiescence in the result arrived at by the Congress of 1789, said:

"No one ever thought of maintaining that the inferior offices, so called in the Constitution, should be held during life. The doubt which arose was, whether the concurrence of the Senate was not requisite to effect a removal in all cases. where it is required to consummate the appointment. The power was finally affirmed to be in the President alone by a majority of both houses of Congress after great deliberation and, perhaps, one of the ablest discussions in the history of the country. 4 Elliott's Debates, 350, 404. That decision was acquiesced in at the time, and has since received the sanction of every department of the Government. It is worthy of special remark that several commentators on the Constitution, who do not entirely admit the correctness of the construction adopted, are, nevertheless, constrained to regard the question as closed. Mr. Justice Story, after reciting the arguments on both sides, remarks: 'If there has been any aberration from the true constitutional exposition of the power of removal (which the reader must decide for himself), it will be difficult, perhaps impracticable, after forty years' experience, to recall the practice to the correct theory.' 3 Story, § 1538. The remarks of Chancellor Kent are still more decisive on this point. He says: 'It may now be considered as firmly and definitely settled; and there is good sense and practical utility

in the construction.' 1 Kent, 311." 4 Opinions Attys. Genl. 603, 609.

In 1851, Attorney General Crittenden, in a written opinion delivered to the President of the United States, stated that the President was not only invested with authority to remove the Chief Justice of the Territory of Minnesota from office, but that it was his duty to do so if it appeared that he was incom-. petent and unfit for the place. Speaking of these territorial judges, Mr. Crittenden said:

"Being civil officers, appointed by the President, by and with the advice and consent of the Senate, and commissioned by the President, they are not exempted from that executive power which, by the Constitution, is vested in the President of the United States over all civil officers appointed by him, and whose tenures of office are not made by the Constitution itself more stable than during the pleasure of the President of the United States."

Concluding he said:

"To answer your inquiry specifically, I have only, in conclusion, to add that, in my opinion, you, as President of the United States, have the power to remove from office the Chief Justice of the Territory of Minnesota, for any cause that may, in your judgment, require it." 5 Opinions Attys. Genl. 288, 291.

In that case the statute under which the Territory of Minnesota was organized, act of March 3, 1849, c. 121, § 9, 9 Stat. 403, 406, provided for the appointment of judges of the Supreme Court, and that they should "hold their offices during the period of four years." In regard to that provision Mr. Crittenden said, in the opinion above referred to:

"That these territorial judges were appointed under a law which limited their commissions to the term of four years, does by no means imply that they shall continue in office during that term, howsoever they may misbehave. An express declaration in the statute that they should not, during the term, be removed from office, would have been in conflict with the Constitution, and would have precluded either the House of Representatives or the President from the exercise

of their respective powers of impeachment or removal. The law intended no more than that these officers should certainly, at the end of that term, be either out of office, or subjected again to the scrutiny of the Senate upon a renomination."

Attorney General Evarts, in speaking of the tenure of civil office act, said that it was passed " to change the doctrine and practice of the Government, by which removal from office, at the mere discretion of the President, had been established as a proper, and, as had been thought, a necessary attendant of the executive duty and responsibility under the Constitution to maintain the efficiency and fidelity of the public service in fulfilling the manifold and incessant obligations of administration and in execution of the laws." 12 Opinions Attys. Genl. 439, 446.

This power has been recognized as extending to officers of the army and navy. Attorney General Cushing, in the case of *Lansing*, 6 Opinions Attys. Genl. 4, said :

" I am not aware of any ground of distinction in this respect so far as regards the strict question of law between officers of the army and any other officers of the Government. As a general rule, with the exception of judicial commissions, they all hold their offices by the same tenure in this respect." See, also, case of *Colonel Belger*, 12 Opinions Attys. Genl. 421, 425, and also the opinion of Attorney General Devens as to the power of the President to dismiss an officer from the military service, 15 Opinions Attys. Genl. 421.

The foregoing references to debates and opinions have not been made for the purpose of assisting us in ourselves arriving at a decision of the question of the constitutional power of the President in his discretion to remove officials during the term for which they were appointed and notwithstanding the existence of a statute prohibiting such removal, but simply for the purpose of seeing what the views of the various departments of the Government have been upon the subject of the power of the President to remove and what claims were made and how much of acquiescence had been given to the proposition that to the President belonged the exclusive power of removal in all cases other than by way of impeach-

ment.  It is unnecessary for us in this case to determine the
important question of constitutional power above stated.

The short review we have taken throws light upon the
question of the true construction of the language used by
Congress in the section of the Revised Statutes under exami-
nation.  Other legislation will be adverted to.

Before doing so, however, we think it well to comment
upon one or two cases which have been said to indicate a
different view on the part of this court as to the power of the
President.  It is said that in the case of *Marbury* v. *Madison,*
1 Cranch, 137, it was held that a justice of the peace in the
District of Columbia was not removable at the will of the
President, as his office was one created by Congress, and
the term was limited in the act.  The case was an original
application to this court for a mandamus against the Secre-
tary of State to compel him to deliver a commission to the
petitioner which had, as was alleged, been signed by the Presi-
dent and sealed by the Secretary, commissioning the petitioner
as one of the justices of the peace for the District of Columbia
under an act of Congress.  The court unanimously held that
it had no jurisdiction to grant an original writ in such case.
Chief Justice Marshall, in the course of his opinion, stated
that "Mr. Marbury, then, since his commission was signed
by the President and sealed by the Secretary of State, was
appointed; and as the law creating the office gave the officer
the right to hold for five years, independent of the executive,
the appointment was not revocable, but vested in the officer
legal rights, which are protected by the laws of his country."

Whatever has been said by that great magistrate in regard
to the meaning and proper construction of the Constitution is
entitled to be received with the most profound respect.  In
that case, however, the material point decided was that the
court had no jurisdiction over the case as presented.  The
remarks of the Chief Justice in relation to the right of an
appointee to retain possession of an office created by Congress
in and for the District of Columbia, as against the power of
the President to remove him during the term for which he
was appointed, are not necessarily applicable to the case of an

officer appointed to an office outside of such District. In the District of Columbia Congress is given by the Constitution power to exercise exclusive legislation in all cases. Art. I, § 8, subdiv. 17, Const. U. S. The view that the President had no power of removal in other cases outside of the District, as has been seen, is one that had never been taken by the Executive Department of the Government, nor even by Congress prior to 1867, when the first tenure of office act was passed. Up to that time the constant practice of the Government was the other way, and in entire accord with the construction of the Constitution arrived at by Congress in 1789.

The case of *United States* v. *Guthrie*, 17 How. 284, has also been cited upon the same point. The question in that case was in regard to the right of the relator Goodrich to a writ of mandamus to compel the Secretary of the Treasury to draw his warrant to pay the amount of salary due to the relator, as he alleged, during the term nominated in his commission appointing him Chief Justice of the Supreme Court of the Territory of Minnesota. The President had removed him within the period of four years, the term named in the statute and in his commission. It was in relation to the power to remove this official appointed under the statute organizing the Territory of Minnesota that Attorney General Crittenden gave his opinion, which is above referred to. This court held that the Circuit Court had no power to issue a writ of mandamus commanding the Secretary of the Treasury to pay a judge of the Territory of Minnesota his salary for the unexpired term of his office from which he had been removed by the President of the United States. The question, whether or not the President had power to remove a territorial judge during his statutory term of office was argued, but was not decided in the case. The prevailing opinion was very brief, and was delivered by Mr. Justice Daniel, and it simply discussed and denied the power of the court to issue the writ. Mr. Justice McLean delivered his own opinion in regard to the power of the President to remove, in which he said that he differed from the opinion of the court in answering the question as it did, and he was of the opinion that the ques-

tion as to the power of the President to remove was before the court, and that such power of removal was not committed solely to the President. The case is not claimed to be authority for the doctrine asserted by Mr. Justice McLean, and it can only be cited for the purpose of showing that there was an exception to the general acquiescence in the power of the President to remove. The case also arose in regard to the dismissal of a judicial officer of a Territory.

The case of *McAllister* v. *United States*, 141 U. S. 174, has also been cited. There is nothing in that case which gives any countenance to the doctrine contended for by the appellant. The court there held that a judge of the District Court of Alaska was not a judge of a court of the United States within the meaning of the exception contained in section 1768, Revised Statutes, relating to the tenure of office of civil officers, and it was held that the judge of the District Court of Alaska, prior to the repeal of that section, was subject to removal, before the expiration of his term of office, by the President in the manner and upon the conditions set forth in that section. Mr. Justice Harlan, in delivering the opinion of the court in that case, and replying to the suggestion that the conclusion reached by the court was not in harmony with some observations of Mr. Chief Justice Marshall in *Marbury* v. *Madison*, stated on page 188, that there was nothing in those observations which militated, in any degree, against the views expressed by him in the case then under consideration, and he said (p. 189): "The decision in the present case is a recognition of the complete authority of Congress over territorial offices, in virtue of 'those general powers which that body possesses over the Territories of the United States,' as *Marbury* v. *Madison* was a recognition of the power of Congress over the term of office of a justice of the peace for the District of Columbia." The case contains nothing in opposition to the contention as to the practical construction that had been given to the Constitution by Congress in 1789 and by the Government generally since that time and up to the act of 1867.

We may now look at the course of legislation in regard to

the appointment of district attorneys from the earliest period in our constitutional history down to the repeal in 1887 of those sections of the Revised Statutes which contained in substance the provisions of the tenure of office acts.

By section 35 of chapter 20, laws 1789, entitled "An act to establish the judicial courts of the United States," it was provided, among other things, as follows : "And there shall be appointed in each district a meet person learned in the law to act as attorney for the United States in such district, who shall be sworn or affirmed to the faithful execution of his office, whose duty it shall be to prosecute in such district all delinquents," etc. 1 Stat. 73, 92. No provision was made in the act for the removal of such officer. In the view held by that Congress as to the power of the President to remove, it was unnecessary. The legislation remained in this condition until the 15th of May, 1820, when the act (chapter 102 of the laws of that year) was passed entitled "An act to limit the term of office of certain officers therein named, and for other purposes." 3 Stat. 582.

The first section of that act provided that from and after its passage "all district attorneys, collectors of the customs, naval officers, and surveyors of the customs, navy agents, receivers of public moneys for lands, registers of the land office, paymasters in the army, the apothecary general, the assistant apothecaries general and the commissary general of purchases, to be appointed under the laws of the United States, shall be appointed for the term of four years, but shall be removable from office at pleasure."

This was an act designed, as indicated by its title, and by the language used in the body of the act, to bring the terms of those offices named therein to an end after the expiration of four years. Its purpose clearly was not to grant an unconditional term of office for that period. It was an act of limitation and not of grant.

The provision in the second section, that the commissions should cease and expire at the end of four years, shows clearly that the intention of Congress was to restrict what had been a possible life term of office to a period of not more than

four years under any one appointment. The provision for a removal from office at pleasure was not necessary for the exercise of that power by the President, because of the fact that he was then regarded as being clothed with such power in any event. Considering the construction of the Constitution in this regard as given by the Congress of 1789, and having in mind the constant and uniform practice of the Government in harmony with such construction, we must construe this act as providing absolutely for the expiration of the term of office at the end of four years, and not as giving a term that shall last, at all events, for that time, and we think the provision that the officials were removable from office at pleasure was but a recognition of the construction thus almost universally adhered to and acquiesced in as to the power of the President to remove.

The legislation in regard to these various officers remained as provided for in this act of 1820 until the passage of the first tenure of office act, March 2, 1867, c. 154, 14 Stat. 430. By that act it was provided that every person holding any civil office to which he had been appointed by and with the advice and consent of the Senate, and all who should be thereafter appointed to any such office, " and shall become duly qualified to act therein, is and shall be entitled to hold such office until a successor shall have been in like manner appointed and duly qualified, except," etc. The reason for the passage of this well-known act is a matter of history. It was the result of a contest which sprang up between President Johnson and the two houses of Congress within a very short time after he became President, and which grew in force and bitterness as the views of Congress on the one side and the President on the other became more opposed to each other in the matters regarding the States lately in rebellion and the proper measures to be pursued for their government. The act was a portion of the legislation passed by Congress at that time for the purpose of keeping those men in office who were then supposed to be friendly to the views of Congress upon that great subject. On the same day, March 2, 1867, Congress passed the army appropriation act, 14 Stat. 485, 486,

c. 170, by which the headquarters of the general of the army were established at Washington, and all orders and instructions relating to military operations issued by the President to the Secretary of War were directed to be issued through the general of the army. Other provisions were also therein contained for the purpose of restraining the action of the President in the exercise of his power to remove or suspend the general of the army. Reference to the subject is made in *Blake* v. *United States*, 103 U. S. 227, 236.

The President, as is well known, vetoed the tenure of office act, because he said it was unconstitutional in that it assumed to take away the power of removal constitutionally vested in the President of the United States — a power which had been uniformly exercised by the Executive Department of the Government from its foundation. Upon the return of the bill to Congress it was passed over the President's veto by both houses and became a law. The continued and uninterrupted practice of the Government from 1789 was thus broken in upon and changed by the passage of this act, so that, if constitutional, thereafter all executive officers whose appointments had been made with the advice and consent of the Senate could not be removed by the President without the concurrence of the Senate in such order of removal.

Mr. Blaine, who was in Congress at the time, in afterwards speaking of this bill, said : "It was an extreme proposition — a new departure from the long-established usage of the Federal Government — and for that reason, if for no other, personally degrading to the incumbent of the Presidential chair. It could only have grown out of abnormal excitement created by dissensions between the two great departments of the Government. . . . The measure was resorted to as one of self-defence against the alleged aggressions and unrestrained power of the executive department." Twenty Years of Congress, vol. 2, 273, 274.

The conduct of President Johnson in regard to the provisions of this act and his contest with Secretary Stanton in relation to the office of Secretary of War led to his impeachment by the House and his trial before the Senate, resulting in his acquittal.

In November, 1868, a new President was elected, who came into office on the 4th of March, 1869. His relations with Congress were friendly, and the motive for the passage of the act of 1867 had ceased to operate. Within five days after the meeting of Congress a bill was introduced in the House to repeal the act of 1867, and was passed by that body. In the Senate, however, the repeal failed, but the act was modified by the act passed on the 5th of April, 1869, 16 Stat. 6, and the first section of the original act was modified so as to provide as follows:

" That every person holding any civil office to which he has been or hereafter may be appointed by and with the advice and consent of the Senate, and who shall have become duly qualified to act therein, shall be entitled to hold such office during the term for which he shall have been appointed, unless sooner removed by and with the advice and consent of the Senate, or by the appointment, with the like advice and consent, of a successor in his place, except as herein otherwise provided."

Assuming the constitutionality of these acts, it is seen that under the act of 1869, a person who had been appointed to an office by and with the advice and consent of the Senate could yet be removed by and with such advice and consent, or by the appointment, with the like advice and consent, of a successor in his place, except as provided in the second section of the act, which provided for appointments during the recess of the Senate, and for the designation of persons to fill vacancies which might happen during that time. No further legislation upon the subject of removals or appointments was enacted for some years, although repeated but unsuccessful attempts were made to repeal the act of 1869, and to leave the President untrammelled by any statute upon the subject. With the legislation of 1869 in force, this appellant would under the facts of this case have been legally removed by the appointment of his successor in the way it occurred.

A revision of the statutes having been undertaken since 1869, section 769 was placed therein as the substance of the statute of 1820. The section is quoted above. It does not

contain the affirmative recognition of the power of removal which is contained in the act of 1820. The reason for the omission plainly was because the insertion of language in the section which in so many words recognized a right of removal would have conflicted with the succeeding sections, embodying the terms of the tenure of office act, which prohibited removals. Section 769 was so drawn that in effect it permitted removals within the term, and it was left to the succeeding sections to make provisions that should limit the right of removal otherwise existing by virtue of the language of that section. The same construction of the language of that section should be adopted which we would apply to the act of 1820, and which was applied by Attorney General Crittenden and acted upon by the President, in the case of the chief justiceship of the Territory of Minnesota, 5 Opinions of Attorneys General, 288, a construction of limitation and not of grant, a construction by which no more than a period of four years is permissible, subject in the meantime to the power of the President to remove. In thus construing section 769 we think full effect is given to its language and the practical construction of former periods is adhered to, while at the same time the purpose of Congress to retain officials in office is also given full effect by the succeeding provisions upon the subject of the tenure of office. The right to remain in office is made to depend upon those subsequent sections, and when in 1887 they were repealed by Congress, 24 Stat. 500, the full legal force and effect of the language used in section 769 was permitted to come in play, freed from the restraints of the sections thus repealed. Such being the case, the persons appointed under section 769 are not entitled to hold for four years as against any power of the President to remove, and in no event can they remain in office longer than that period without being reappointed. This construction of the act as one of limitation, we think, in the light of the history of the subject, is a most natural and proper one.

The argument of the appellant, however, shows, if adopted, that the result of the passage of the repealing statute of 1887 has been to limit the power of the President more than it was limited before that statute was passed. While the tenure of

office provisions existed, it is conceded that the President might remove an officer like a district attorney within the four years for which he was commissioned, provided his removal was concurred in by the Senate or was effected by the appointment of his successor by and with the advice and consent of the Senate; yet, now since the repeal of those sections which it was supposed limited and restrained the power of the President, he is still further restrained and limited in his power, because under the construction as claimed by the appellant he cannot now remove an officer within the four years even with the advice and consent of the Senate or by the appointment of his successor by the like advice and consent. This extraordinary result is reached by construing, according to appellant's views, section 769 as meaning to give a term of office of four years in any event, and while this term of office was, before the repeal of the sections above named, subject to be shortened in accordance with their provisions, yet as they have been repealed it leaves section 769 in force as granting an unconditional and absolute term of four years which cannot be shortened by the President, or the President and Senate combined, and which leaves the incumbent subject only to removal by the slow and weary process of impeachment by the House and a conviction thereon and a removal by the Senate as a punishment.

This could never have been the intention of Congress. On the contrary, we are satisfied that its intention in the repeal of the tenure of office sections of the Revised Statutes was again to concede to the President the power of removal if taken from him by the original tenure of office act, and by reason of the repeal to thereby enable him to remove an officer when in his discretion he regards it for the public good, although the term of office may have been limited by the words of the statute creating the office. This purpose is accomplished by the construction we give to section 769, while the other construction turns a statute meant to enlarge the power of the President into one circumscribing and limiting it more than it was under the law which was repealed for the very purpose of enlarging it.

After a careful review of the case before us we are of the opinion that the Court of Claims committed no error, and its judgment is

*Affirmed.*