# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 1, 2022       Decided June 27, 2023

No. 22-5047

ROGER SEVERINO,
APPELLANT

v.

JOSEPH R. BIDEN, JR., IN HIS OFFICIAL CAPACITY AS PRESIDENT
OF THE UNITED STATES, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-00314)

———

*Christopher Mills* argued the cause for appellant. With
him on the briefs was *Jonathan Mitchell*.

*Adam C. Jed*, Attorney, U.S. Department of Justice,
argued the cause for appellees. With him on the brief were
*Brian M. Boynton*, Principal Deputy Assistant Attorney
General, and *Mark B. Stern* and *Joshua M. Salzman*, Attorneys.

Before: MILLETT, WILKINS, and WALKER, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* MILLETT.

Concurring opinion filed by *Circuit Judge* WALKER.

MILLETT, *Circuit Judge*:   The Administrative Conference of the United States is a governmental entity that produces research, recommendations, and guidance on how to improve the operation of Executive Branch agencies.   The Conference has no power to enforce its suggestions; its only power is to persuade.

A Council of ten members, appointed by the President, supervises the work of the Conference.   The question in this case is whether an appointee to the Council is removable at will by the President.   Because removal at will is the presumption under the Constitution, and because nothing in the text of the Council's organic statute or about the Council's function within the Executive Branch indicates that Congress constrained the President's presumptive removal authority, we affirm the judgment of the district court dismissing the complaint for failure to state a claim.

**I**

**A**

Congress created the Administrative Conference of the United States in 1964 to provide a forum for Executive Branch agencies to "cooperatively study mutual problems, exchange information, and develop recommendations for action[.]"   5 U.S.C. § 591(1).   Congress's goals included, among other things, developing an administrative system in which (i) "private rights may be fully protected[,]" (ii) regulatory actions "may be carried out expeditiously in the public interest[,]" and (iii) there is "more effective public participation and efficiency in the rulemaking process[.]"   *Id.* § 591(1)–(2).

The Conference consists of a Chairperson appointed by the President and confirmed by the Senate, and 75 to 101 members who reflect a mix of governmental and outside experts. 5 U.S.C. § 593(a)–(b). From within the government, the Conference includes a representative from each independent agency and Executive department. *Id.* § 593(b)(2)–(4). From outside the government, the Chairperson appoints up to 40 experts who "provide broad representation of the views of private citizens[.]" *Id.* § 593(b)(6). Other than the Chairperson, members of the Conference are not paid for their service. *Id*. § 593(c).

The Conference's principal task is to "study the efficiency, adequacy, and fairness" of administrative procedures, in part by "collect[ing] information and statistics" from agencies and using that data to produce research on the Executive Branch. *See* 5 U.S.C. § 594(1), (3). In so doing, the Conference must "arrange for interchange" among agencies with potentially valuable knowledge. *See id.* § 594(2). On the basis of its research, the Conference as a whole may "adopt such recommendations as it considers appropriate for improving administrative procedure[,]" which become the official positions of the Conference. *Id.* § 595(a)(1).

In short, the Conference studies administrative procedure and makes recommendations on "how it could be improved" to better "serve the public interest." Antonin Scalia & Stephen G. Breyer, *Reflections on the Administrative Conference*, 83 GEO. WASH. L. REV. 1205, 1207 (2014) (quoting Lyndon B. Johnson, Remarks at the Swearing In of Jerre S. Williams as Chairman, Admin. Conf. of the U.S., 1 Pub. Papers 68 (Jan. 25, 1968)).

The Conference's functions are strictly advisory. It has "no power whatever to enforce its own recommendations."

H.R. REP. NO. 1565, 88th Cong., 2d Sess. 4 (1964); *see generally* 5 U.S.C. § 594 (authorizing the Conference to "study," "make recommendations," "arrange for interchange," "collect information," and "provide assistance"). Rather, to encourage the adoption of its proposals, the Conference relies on the "tact and diplomacy" of its staff and on the content of its ideas. Scalia & Breyer, *supra*, at 1207.

Congress also created a Council to oversee the Conference. The Council consists of the Chairperson of the Conference and ten other members appointed by the President. No more than five of the members can be employees of the federal government. 5 U.S.C. § 595(b). The Council's "functions resemble those of a corporate board of directors." Scalia & Breyer, *supra*, at 1208. Among other duties, the Council sets the agenda and schedule for meetings of the Conference, proposes bylaws and regulations for the Conference's consideration, and approves the Chairperson's budget for the Conference. *See* 5 U.S.C. § 595(b)(1)–(8). Each Council Member (except the Chairperson) is appointed for a three-year term. *Id.* § 595(b).

**B**

Roger Severino was first appointed to the Council on July 24, 2020. Because Severino was then serving as Director of the Office of Civil Rights in the Department of Health and Human Services, he occupied one of the five seats available for government employees. Although he was appointed for a standard three-year term, when Severino resigned his government employment on January 15, 2021, he lost his seat on the Council. *See* 5 U.S.C. § 595(b) ("[T]he service of any member ends when a change in his employment status would make him ineligible for Council membership under the conditions of his original appointment."). The next day, then-

President Trump reappointed him to a new three-year term, this time as a non-governmental member of the Council.

President Biden took office four days later. On February 2, 2021, the Deputy Director of the Presidential Personnel Office emailed Severino "on behalf of President Biden" to request Severino's "resignation from the Administrative Conference of the United States Council by 5:00 p.m. ET tomorrow." Am. Compl., Ex. D, J.A. 25. Shortly after 5:00 the next evening, the Deputy Director emailed Severino to inform him that his appointment had been terminated.

## C

Severino filed suit the same day he was fired, naming as defendants President Biden, the Director and Deputy Director of the Presidential Personnel Office, the Conference's then-Vice Chairperson, who also served in the role of Executive Director, and the United States of America. Severino's amended complaint, filed a few months later, alleged that the statute creating the Council precluded his removal from the Council without cause. Severino requested that the court issue an injunction requiring that the President "restore[]" him to his position on the Council. Am Compl. ¶ 32, J.A. 12. He also sought a declaration that his termination was void.

The district court dismissed the amended complaint for failure to state a claim. *Severino v. Biden*, 581 F. Supp. 3d 110, 112 (D.D.C. 2022); *see* FED. R. CIV. P. 12(b)(6). The court first ruled that Severino's injuries were redressable for purposes of Article III standing. The court explained that, even if an injunction ordering the President to reinstate an individual is not available, a government official challenging his removal from office can obtain relief by enjoining inferior officials to treat the appointee as occupying his claimed job.

*Severino*, 581 F. Supp. 3d at 116 (citing *Swan v. Clinton*, 100 F.3d 973, 979–980 (D.C. Cir. 1996)).   On the merits, the court held that the "plain meaning" of the Conference's organic statute "imposes no removal restriction" on the President because a statutorily prescribed term of office imposes only a ceiling on an appointee's length of service, not a guaranteed tenure.   *Id.* at 118.

Severino timely appealed.

## II

The district court's jurisdiction arose under 28 U.S.C. § 1331.   We have jurisdiction under 28 U.S.C. § 1291.   We review *de novo* both the district court's dismissal of the complaint for failure to state a claim and that court's interpretation of the Conference's organic statute.   *Orozco v. Garland*, 60 F.4th 684, 688 (D.C. Cir. 2023).

## III

We start, as we must, by ensuring our power to resolve this case.   *See United States v. Philip Morris USA, Inc.*, 840 F.3d 844, 848 (D.C. Cir. 2016).   Under Article III of the Constitution, a plaintiff must prove standing to sue "for each claim" and for "each form of relief that is sought."   *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017). A plaintiff will have standing if he shows that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."   *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).   It is indisputable that Severino has satisfied the first two elements of standing: Assuming the merits of his argument, his termination from the

Council was a cognizable injury directly traceable to the defendants.

The difficulty lies in determining whether that injury is redressable by the court. *See Western Coal Traffic League v. Surface Transp. Bd.*, 998 F.3d 945, 950–951 (D.C. Cir. 2021). Severino seeks a judicial order that would "restore[] [his] appointment to the Council[.]" Am. Compl. ¶ 32(c), J.A. 12. President Biden is the only person with the power to reappoint Severino to the Council. *See* 5 U.S.C. § 595(b). But enjoining the President to make a formal appointment would be a constitutionally exceptional step. A court generally may not "enjoin the President in the performance of his official duties." *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality opinion) (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866)); *see id.* at 826 (Scalia, J., concurring in part and concurring in the judgment). *Franklin* left open a narrow potential exception for injunctions that require the President to perform a "purely 'ministerial' duty" over which he has no discretion. *See id.* at 802 (plurality opinion) (quoting *Johnson*, 71 U.S. (4 Wall.) at 498); *Swan*, 100 F.3d at 977. It is unclear, under our precedent, whether the injunction Severino requests could qualify as ministerial in nature. *See Swan*, 100 F.3d at 977–978.

We need not confront that difficult question because our jurisdiction does not depend on deciding whether an injunction ordering a presidential appointment would be available or appropriate. The redressability prong of standing requires only that we be able to offer Severino "at least some of the relief" he seeks. *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021). And we have held it sufficient for Article III standing if we can enjoin "subordinate executive officials" to reinstate a wrongly terminated official "*de facto*," even without a formal presidential reappointment. *Swan*, 100 F.3d at 980 (Inferior

officials could not "officially" reinstate a member of the National Credit Union Administration board and remove his predecessor, but could "accomplish these deeds *de facto* by treating [plaintiff] as a member of the NCUA Board and allowing him to exercise the privileges of that office[.]").[1]

The complaint sufficiently alleges that a similar form of relief is available in this case. Our power to enjoin the Conference's Chairperson is undisputed, and, at least in principle, the Chairperson may "includ[e] [Severino] in Board meetings," "giv[e] him access to his former office," and permit him to cast votes as if he were a Council member, just the same forms of relief we held sufficient in *Swan*. *See* 100 F.3d at 980.

There is another potential wrinkle though. Congress has, by statute, limited the Council to ten members, and it is currently fully staffed. *See* 5 U.S.C. § 595(b); Administrative Conference of the United States, *Council* (May 31, 2023), https://perma.cc/2DJV-BPBP. That could mean that, at the end of the litigation, there would be no seat available for which Severino could serve as even the *de facto* occupant.

But this case arises at the motion to dismiss stage, in which Severino need only plausibly allege that relief could be afforded on his claim. *See Bennett v. Spear*, 520 U.S. 154, 170–171 (1997) (A plaintiff's burden to show that his injury will "likely be redressed" is "relatively modest" at the motion to dismiss stage.) (internal quotation marks omitted). Here,

---

[1] Under *Swan*, we need only analyze the redressability of each of Severino's claims and requests for relief against at least one defendant, even if that claim is addressed to several defendants. So we need not separately address Severino's standing to sue President Biden specifically because appropriate relief could be awarded against other defendants. *See Swan*, 100 F.3d at 979.

the government has conceded that, were Severino to prevail on the merits, the Conference would be prepared either to identify for removal a specific member of the Council occupying Severino's seat or to comply with other equitable relief granting Severino at least some of the privileges of his office. *See* Oral Arg. Tr. 47:9–24. At the motion to dismiss stage, that is sufficient to demonstrate that Severino's asserted injury is judicially redressable, even though greater specificity as to the availability of relief might be required at later stages in the litigation. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (Each element of standing must be supported "with the manner and degree of evidence required at the successive stages of litigation.").

**IV**

Although we have jurisdiction to hear Severino's lawsuit, we agree with the district court that his complaint does not state a legally viable claim on the merits. President Biden had full statutory and constitutional authority to terminate Severino without cause.

Under the Constitution, the "President's removal power is the rule, not the exception." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2206 (2020); *see also Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 492–493 (2010); *Kalaris v. Donovan*, 697 F.2d 376, 389 (D.C. Cir. 1983). That is because Article II of the Constitution gives the President the sole responsibility to "take Care that the Laws be faithfully executed." U.S. CONST., Art. II, § 1, cl. 1; *id.* § 3. To fulfill that duty, the President generally must be able to "control[] those who execute the laws" on his behalf. *Seila Law*, 140 S. Ct. at 2197 (quoting 1 Annals of Cong. 463 (1789)). Presidential control, in turn, requires "the ability to remove executive officials, for it is 'only the authority that can

remove' such officials that they 'must fear and, in the performance of [their] functions, obey.'" *Id.* (quoting *Bowsher v. Synar*, 478 U.S. 714, 726 (1986)). In addition, without the power of removal, "the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Free Enter. Fund*, 561 U.S. at 514.

Because of the background presumption that the President may remove anyone he appoints, Congress must make it clear in a statute if it wishes to restrict the President's removal power. *See Carlucci v. Doe*, 488 U.S. 93, 99 (1988) ("[A]bsent a 'specific provision to the contrary, the power of removal from office is incident to the power of appointment.'") (quoting *Keim v. United States*, 177 U.S. 290, 293 (1900)). Courts will not assume Congress legislated a potential separation of powers problem unless the statutory text makes Congress's intent to test constitutional lines apparent. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018); *Watkins v. United States*, 354 U.S. 178, 204 (1957) ("[E]very reasonable indulgence of legality must be accorded to the actions of a coordinate branch of our Government.").

In construing statutes, the Supreme Court has recognized only two ways Congress can send such a clear signal. First, Congress may impose a removal restriction in the plain text of a statute. *See Seila Law*, 140 S. Ct. at 2206–2207; *Carlucci*, 488 U.S. at 99. Second, Congress may clearly indicate its intent to restrict removals through the statutory structure and function of an office. *See Seila Law*, 140 S. Ct. at 2206 (citing *Humphrey's Executor v. United States*, 295 U.S. 602 (1935));

11

*Wiener v. United States*, 357 U.S. 349, 353 (1958).   Congress did neither when it created the Council.[2]

**A**

Nothing in the text of the statute creating the Council clearly expresses a congressional intent to trim the President's removal power.   The statutory text nowhere imposes conditions or constraints on either the timing of or reasons for removal of Council members.

Severino's textual argument relies entirely on Congress's provision that "[t]he term of each member" of the Council, "except the Chairman, is 3 years." 5 U.S.C. § 595(b). Severino reasons that the word "term" means "the time for which something lasts," so that a *term* of three years implies that earlier removals are off the table.   *See* Severino Opening Br. 11 (citing *Term*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2358 (1966) (def. 2(a)).

Severino is incorrect.   When used in federal appointment statutes, the word "term" has a long-settled meaning of limiting a person's tenure in office, not investing the person with a guaranteed minimum period of service.   A "term," in other words, is a ceiling, not a floor, on the length of service.

---

[2]   These two tests ask only whether a statute should be read as limiting the President's removal power.   If a statute does so, the question of the constitutionality of that restriction would still need to be decided.   *See, e.g.*, *Free Enter. Fund*, 561 U.S. at 486–487 (first construing the Public Company Accounting Oversight Board's statutory scheme to verify that members are protected by for-cause removal and then, "with that understanding," proceeding to the constitutional analysis).

For that understanding, we need look no further than the very sources Severino cites. *See Term*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2358 (1966) (def. 2a) ("[A] *limited or definite* extent of time: the time for which something lasts") (emphasis added); *id.* (def. 3a) ("[A] time or date fixed or agreed upon for an action or as a boundary between periods"); *Term*, WEBSTER'S NEW WORLD COLLEGIATE DICTIONARY 1503 (1st ed. 1968) (def. 3) ("[A] period of time having definite limits; * * * a stipulated length of time that a person *may* hold office.") (emphasis added).

Of even greater relevance, the Supreme Court has long held that a fixed statutory term of service leaves untouched the President's presumptive removal power. In *Parsons v. United States*, 167 U.S. 324 (1897), the Supreme Court upheld the President's plenary power to remove United States Attorneys from office notwithstanding a statute providing that they "shall be appointed for a term of four years." *Id.* at 327–328, 338–339. Reading that provision in light of the Constitution's investment of broad authority in the President as head of the Executive Branch, the Court held that Congress meant for the four-year term to "provid[e] absolutely for the expiration of the term of office at the end of four years," and not to guarantee "a term that shall last at all events for that time[.]" *Id.* at 339.

The Supreme Court subsequently reaffirmed *Parsons*' understanding of a defined term of office as a cap rather than an entitlement. In *Myers v. United States*, the Supreme Court endorsed and reapplied *Parsons*. *Myers*, 272 U.S. 52, 146–147 (1926). Relying on the President's inherent power of removal, the Court held that it was unconstitutional for Congress to require the President to seek "the advice and consent of the Senate" before firing a postmaster. *See id.* at 107, 116–117. A key step in the Court's reasoning was to show that the power of removal had long been viewed as vested

in the office of the President.  *Id.* at 146.  That proposition, the Court explained, was "authoritatively settled" by *Parsons*, which determined that a statute "providing that district attorneys should be appointed for a term of four years * * * included the power of removal by the President[.]"  *Id.* at 146–147.

Even the dissenting opinions in *Myers* acknowledged that *Parsons* fixed the plain meaning of a set term of office under federal law.  *See Myers*, 272 U.S at 241 (Brandeis, J., dissenting) ("It is settled that * * * [a] clause fixing the tenure will be construed as a limitation, not as a grant; and that, under such legislation, the President, acting alone, has the power of removal."); *id.* at 226 (McReynolds, J., dissenting) (*Parsons* "regarded the specification of a definite term as not equivalent to the positive inhibition of removal by Congress.").

That precedent is the backdrop against which Congress legislated the Conference into being and created a three-year term for Council members.  When Congress uses words "which had at the time a well-known meaning * * * in the law of this country," those words are to be understood "in that sense" absent strong contextual indicia to the contrary. *Lorillard v. Pons*, 434 U.S. 575, 583 (1978) (quoting *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 59 (1911)); *see also United States v. Wilson*, 290 F.3d 347, 357 (D.C. Cir. 2002) ("Congress is presumed to be aware of established practices and authoritative interpretations of the coordinate branches.").  Doubly so when a contrary interpretation of statutory language would create a separation of powers issue that hewing to settled meaning would not.  We will not assume Congress picked a constitutional fight unless it makes that intent crystal clear.  *See Jennings*, 138 S. Ct. at 842.

Severino identifies no strong contextual indicia indicating that "term" has a different meaning in the organic statute creating the Administrative Conference and Council. As a result, when Congress provided for a three-year term of office, it did so with the settled understanding that its fixed term of service in no way limited the President's removal power.

Severino's generic references to dictionaries and state supreme court decisions overlook that a fixed "term" of office has an established and specialized meaning in federal statutes because of background separation of powers principles. Indeed, in light of *Parsons*, the state supreme court decisions Severino cites fully recognized that, when it came to federal law, fixed-term appointments bore a distinctive meaning, whether or not that same meaning was carried over into state law. *See, e.g.*, *Holder v. Anderson*, 128 S.E. 181, 184–185 (Ga. 1925) (*Parsons* "was predicated upon the federal Constitution and acts of Congress, " whereas "the Governor of this state has no inherent power to remove a public officer[.]"); *State v. Rhame*, 75 S.E. 881, 883 (S.C. 1912) (*Parsons* is inapposite because "the Constitution and statutes of the state strongly negative" "the power of removal as an incident of the power of appointment when the term of office is fixed by the statute[.]"); *cf. Kearcher v. Members of Council of Borough of Mt. Oliver*, 69 A.2d 394, 396 (Pa. 1949) ("An act that fixes the term of an office is merely an act designed to bring the terms of the officer named therein to an end after the expiration of the stipulated term. Its purpose clearly is not to grant an unconditional term of office."). There certainly is no principle of statutory interpretation indicating that Congress in 1961 used the word "term" not in conformity with Supreme Court precedent, but instead in the sense it was sometimes used in some States as a matter of state law.

15

Invoking the canon against reading statutory language as surplusage, Severino points to the statutory provision stating that appointees are permitted to continue their service in office pending the appointment of a successor, *see* 5 U.S.C. § 595(b). Severino argues that reading the word "term" to permit at-will dismissal would make the continuance-in-office provision little more than a suggestion to the President. Severino Opening Br. 26–27.

Severino is mistaken. Applying the three-year term as a cap but not a guarantee still gives Section 595(b)'s creation of that term work to do—specifically, to mark the point in time when a fresh presidential appointment is due. *See Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) (surplusage canon applies when the reading of a statutory provision would make it "entirely redundant" or of "no consequence") (internal quotations omitted). As for the part of Section 595(b) that allows members to serve past the expiration of their terms, that permission simply reflects Congress's interest in ensuring the continuity of the Conference's operations by keeping unremoved Council members on board until a successor is sworn in. Nothing about those provisions even hints at a congressional intent to displace the President's settled removal power.

Ultimately, Severino offers no textual basis for holding that Congress intended to deviate from the longstanding meaning of a fixed-term provision laid out in *Parsons* and *Myers*: A defined term of office, standing alone, does not curtail the President's removal power during the office-holder's service.

**B**

Neither has Severino shown that the structure of the agency or the functions assigned to Council members clearly evidence Congress's intent to constrain the President's removal power.

In *Humphrey's Executor*, the Supreme Court held that *Myers*' presumption of removability did not apply to members of the Federal Trade Commission because that agency exercises "no part of the executive power." 295 U.S. at 628. Specifically, the Court determined that the Commission acts "as a legislative agency" in reporting to Congress and "as an agency of the judiciary" in holding administrative hearings, and that the "character" of both functions is inconsistent with allowing at-will removal by the President. *Id.* at 628–629. In addition, the statute expressly qualifies the President's removal power by confining the termination of Commissioners to the grounds of "inefficiency, neglect of duty, or malfeasance in office." *Id.* at 620 (quoting Federal Trade Commission Act, Pub. L. No. 63–203, § 1, 38 Stat. 717, 717–718 (1914)). The Supreme Court ruled that, taken together, the structural character and function of the Commission as well as the express textual restraint on dismissals demonstrated Congress's intention to confine the President's removal authority. *Id.* at 625–626.

The Court again applied a functional analysis in *Wiener v. United States*. That case concerned the War Claims Commission, which Congress created to adjudicate Americans' injury and property claims against Nazi Germany and its allies. *See* 357 U.S. at 350 (citing War Claims Act of 1948, Pub. L. No. 80–896, § 3, 62 Stat. 1240, 1241). Once more, the Court drew a sharp distinction between *Myers*' presumption of removability—which remained good law as to

"all purely executive officers," *id.* at 352—and the quasi-judicial functions of the War Claims Commission. The Commission, the Court reasoned, could not fulfill its duty to fairly apply "evidence and governing legal considerations" to resolve "the merits of each claim," without some removal protections. *Id.* at 355–356. As a result, although Congress nowhere mentioned removals in the Commission's organic statute, the Court inferred from the Commission's judicial functions that Congress meant to sheath "the Damocles' sword of removal by the President" during the Commissioners' terms. *Id.* at 356; *see also Collins*, 141 S. Ct. at 1783 n.18 (*Wiener* was decided "on the rationale that the War Claims Commission was an adjudicatory body, and as such, it had a unique need for 'absolute freedom from Executive interference.'") (quoting *Wiener*, 357 U.S. at 353).

So under *Humphrey's Executor*'s and *Wiener*'s binding precedent, when Congress assigns to an agency quasi-judicial or quasi-legislative functions that are deemed to be operationally incompatible with at-will Presidential removal, that can be a relevant signal that Congress meant for members of that agency to be shielded from Presidential removal, even without an explicit textual statement to that effect. *See Seila Law*, 140 S. Ct. at 2206 ("[W]e do not revisit *Humphrey's Executor* or any other precedent today[.]"); *see also Collins*, 141 S. Ct. at 1783 n.18.

Those cases are of no help to Severino. The Council, as part of the Administrative Conference, is structurally housed squarely within the Executive Branch and serves to advise personnel in and components of the Executive Branch. Neither the Conference nor the Council has any quasi-legislative or quasi-judicial duties. Producing advice for the President and to his delegees is a quintessential example of a "purely executive" function. *Wiener*, 357 U.S. at 352 (quoting

*Humphrey's Executor*, 295 U.S. at 628). Indeed, the Constitution gives pride of place in Article II to the President's power to seek advice from principal officers. U.S. CONST., Art. II, § 2, cl. 1 ("The President * * * may require the Opinion, in writing, of the principal Officer in each of the executive Departments[.]"). We, too, have recognized that gathering trusted advice is a core executive function. *See Association of American Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993) ("Article II * * * gives the President * * * the flexibility to organize his advisers and seek advice from them as he wishes.").[3]

Producing advice for the Executive Branch is the Conference's *raison d'être.* The Conference was created specifically for the purpose of helping "[f]ederal agencies, assisted by outside experts" to "study mutual problems, exchange information, and develop recommendations[.]" 5 U.S.C. § 591(1). The Executive Branch is the planet around which all of the Conference's responsibilities revolve. The Conference studies administrative agencies, arranges for discussion about them, collects data about them, and makes recommendations about and to them. *See generally id.* § 594.

To be sure, a few other statutes require the Chairperson to submit informational reports to Congress on behalf of the Conference. *See* 5 U.S.C. § 595(c); *id.* § 504(e)(1) (annual report under the Equal Access to Justice Act). Similarly, given that executive agencies are ultimately subject to

---

[3] While the provision of advice to the President is an executive function, the Executive Branch has long recognized Congress's authority to regulate appointments to advisory committees, at least to the extent they are funded by appropriations. *See* Constitutionality of the Federal Advisory Committee Act, 1 Op. O.L.C. Supp. 502, 504–506 (1974). That question is not before us in this case.

legislation and judicial oversight, the Conference is unsurprisingly permitted to inform the legislative and judicial branches about aspects of administrative procedure. *Id.* § 594(1). But the overwhelming majority of the Conference's work focuses on and contributes to the internal workings of the Executive Branch. The occasional assistance it provides to the other Branches is a byproduct of that mission.

Nor does the Conference exercise anything like the quasi-judicial functions that proved so determinative in *Humphrey's Executor* and *Wiener*. *See Collins*, 141 S. Ct. at 1783 n.18. The Court in *Wiener* assumed that Congress would not intend for those adjudicating individuals' claims to funds held by the Secretary of the Treasury to be subject to a President's use of the removal power to "influence[] the Commission in passing on a particular claim." *See* 357 U.S. at 355–356.

Likewise, the Court in *Humphrey's Executor* discerned Congress's intent that members of an agency charged with the quasi-judicial role of functionally "act[ing] as a master in chancery" under the Federal Trade Commission Act would need to "maintain an attitude of independence" for which removal protections were necessary. 295 U.S. at 628–629. That conclusion was bolstered by the agency's "quasi-legislative[]" duty of giving definition to the general prohibition on "unfair methods of competition" included in the Federal Trade Commission's organic statute. *Id.*

The Conference, though, does not exercise authority over anyone, much less adjudicate individual claims. Its work is meant to be integrated within the Executive Branch, not isolated from it. *Cf. Wiener*, 357 U.S. at 353. The only power Congress has conferred on the Conference is to collect data from federal agencies, and its central duty is to consult with and be consulted by those agencies. *See, e.g.*, 5 U.S.C.

§ 504(e)(1); Negotiated Rulemaking Act of 1990, Pub. L. No. 101–648, § 3(a), 104 Stat. 4969, 4975 ("An agency may consult with the Administrative Conference of the United States[.]"); Administrative Dispute Resolution Act of 1990, Pub. L. No. 101–552, § 3(a)(1), 104 Stat. 2736, 2736 (similar).

Presidential influence is completely consistent with the Conference's wholly advisory and consultatory mission. Congress certainly thought so. After all, it made roughly half of the Conference's membership, and up to half of the members of the Council, employees of the Executive Branch. *See* 5 U.S.C. §§ 593(b), 595(b). These members naturally represent their home agencies and, by proxy, the President—and most will be subject to at-will removal in their day jobs. At the same time, Congress gave all members of the Council only three-year terms, ensuring that no member could outlast a President. *See id.* § 595(b). Far from the "absolute freedom from Executive interference" deemed so mission-critical in *Humphrey's Executor* and *Wiener*, *see Wiener*, 357 U.S. at 353, the Council's design and function reflect the opposite: Integration and cooperation with the Executive Branch is vital to the successful accomplishment of the Conference's consultative role.

Congress also, of course, designed aspects of the Conference and its Council to encourage independent thinking. For example, staggered terms promote "the independence, autonomy, and non-partisan nature" of an agency, and the Council's initial batch of members indeed served staggered terms. *Wilson*, 290 F.3d at 359. But Congress can hardly have expected those staggered terms to last, given that the Council's governmental members—perhaps half the Council—would frequently lose their seats between Presidential administrations. *See* 5 U.S.C. § 595(b). Likewise, the fact that non-governmental members are unpaid,

*see id.* § 593(c), gives them a certain independence from the President and Congress. The members' volunteer service, though, only underscores how diametrically opposed their role is to the weighty quasi-judicial jobs at issue in *Wiener* and *Humphrey's Executor*.

In short, Congress designed the Conference to be a forum inside the Executive Branch for shop talk and collaboration with external experts. It has no adjudicatory or legislative features that would clearly signal a need for some measure of independence from Presidential control. And nothing in the text of the legislation creating the Conference and Council hints at a congressional intent to limit the President's removal power, let alone overcomes the presumption of presidential control over Executive Branch officials. The statute, in other words, gives no indication that Congress intended to take the unusual and potentially constitutionally troublesome step of tying the President's hands when it comes to at-will removal of such a core Executive Branch officer as a member of the Administrative Conference's Council.

## V

While precedent teaches that Congress sometimes has the power to contract the President's power to remove some agency officials at will, Congress, at the outset, must clearly express its intent to do so. Congress gave Severino a three-year term using language that, for more than a century, courts have interpreted as having no effect on the President's removal power. And Congress left no structural or contextual clues that protection from removal was integral, or even desirable, to the performance of Council members within an advisory organization housed squarely in the Executive Branch. The presumption of at-will removal remains at full force in this case.

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*

WALKER, *Circuit Judge*, concurring:

As the majority explains, Congress did not restrict the President's power to remove members of the Council supervising the Administrative Conference of the United States. *See* 5 U.S.C. § 595(b) (giving members a three-year term, but not mentioning removal). So President Biden was free to fire Roger Severino.

That result means that we need not decide whether a broad reading of *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and *Wiener v. United States*, 357 U.S. 349, 353 (1958), survives later decisions emphasizing the President's "authority to remove those who assist him in carrying out his duties." *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2198 (2020) (cleaned up); *see also Collins v. Yellen*, 141 S. Ct. 1761 (2021); *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010). Broad or narrow, *Humphrey's* and *Wiener* are of no help to Severino.

Though it is an issue for another day, it seems to me that only a very narrow reading of those cases is still good law. In *Seila Law*, the Court "repudiated almost every aspect of *Humphrey's*" — and by extension *Wiener*. 140 S. Ct. at 2212 (Thomas, J., concurring); *see Wiener*, 357 U.S. at 356 (applying the "philosophy of *Humphrey's*"). In particular, the Court "[b]ack[ed] away from" the reasoning in *Humphrey's* that removal restrictions may pass constitutional muster if an executive agency exercises "quasi-legislative and quasi-judicial power." *Seila Law*, 140 S. Ct. at 2198 (cleaned up). Indeed, it has doubted Congress's ability to vest *any* judicial power (whether "quasi" or not) in an executive agency. *Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 138 S. Ct. 1365, 1372-73 (2018) ("Congress cannot confer the Government's 'judicial Power' on entities outside Article III"

(cleaned up)).  And if Congress may not vest *any* nonexecutive power in an executive agency, it might be that little to nothing is left of the *Humphrey's* exception to the general rule that the President may freely remove his subordinates.